846 A.2d 403

**KOBRINE, L.L.C., et al.**

v.

**Bruce METZGER, et al.**

**No. 59, Sept. Term, 2003.**

Court of Appeals of Maryland.

April 8, 2004.

S. Scott Morrison (Nicole Lynn Kobrine, Katten, Muchin, Zavis, Rosenman, on brief), Washington, for petitioners.

John L. Erly, Nancy J. Gordillo (Laurence W.B. Cumberland, Cumberland & Erly, LLC, on brief), Prince Frederick, for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

WILNER, J.

The issue before us is whether the Circuit Court for Calvert County erred in concluding that each of the 56 lot owners in the Harbor Light Beach (HLB) subdivision (1) owned, in common, a one-fifty-sixth undivided fee simple interest in a reserved lot in Section 2 of that subdivision that had been deeded to petitioner Kobrine, L.L.C., which we shall henceforth refer to as the KLLC lot, and (2) also had an express and an implied recreational use easement in that lot.[1] With one minor exception, the Court of Special Appeals affirmed the Circuit Court's judgment. *Kobrine, L.L.C. v. Metzger,* 151 Md.App. 260, 824 A.2d 1031 (2003). Because we disagree with most, though not all, of the lower court judgments, we shall vacate them and direct a remand for the entry of a more limited judgment.

---

**1.** The relevant documents and the opinions of the Circuit Court and the Court of Special Appeals refer to 56 lot owners or the owners of 56 lots. Because some of the 56 lots referred to in the documents were purchased under common ownership and combined, there are actually fewer than 56 lots. Some are owned by one person, while others are owned by husband and wife together, so there are neither 56 lots nor 56 owners. The lower courts nonetheless continued to speak of 56 lots and 56 lot owners, but treated an owner or owners of combined lots as having a multiple of a 1/56th interest in each of the 56 lots that had been combined. For convenience, we too shall speak of 56 lots or lot owners.

## BACKGROUND

Although it started out differently, this case, as it ultimately was presented for decision, was a battle between two lot owners in Section Two of the HLB subdivision. Dr. and Ms. Kobrine own Lot 3 in Block E—a lot that directly borders the Patuxent River. Bruce Metzger owns Lot 8 in Block A—a non-riparian lot that at one time had access via an interior road to the KLLC lot, which was immediately to the west of the Kobrine lot and also bordered the Patuxent River. Because, on the recorded plat of Section Two, the KLLC lot was marked "Area Reserved For the Use of Lot Owners," some of the lot owners in the subdivision used that parcel not just for access to the river but also for picnics, parties, and other recreational uses. In 1999, the Kobrines, through a limited liability company they created, Kobrine L.L.C. (KLLC), purchased the abutting KLLC lot and precluded Metzger and other subdivision lot owners from continuing to use it. Access to the river remained available through a nearby thirty-foot road.

On behalf of himself and a homeowners association that he created, HLB Home Owners Association, Inc. (HOA), Metzger sued to have KLLC's title declared invalid. HOA owns no property in the subdivision and has no contractual or other legally cognizable interest in any of the roads in the subdivision or in the KLLC lot. No other lot owner in the subdivision seeks to upset or impair KLLC's title.

The land comprising the HLB subdivision was once owned by J. Earl Brown and his wife, Ruth. In 1955, the Browns recorded a plat entitled " 'Harbor Light Beach' Subdivision Section No. 1," a copy of which is attached to this Opinion as Appendix A. The plat laid out 22 residential lots, all but five of which bordered Mill Creek, a tributary of the Patuxent River. Abutting some of the lots on the south was a 30–foot road that turned north and ran to Mill Creek, thus providing access from the five non-riparian lots to the water. The Browns signed the plat, attesting that certain statutory requirements had been met. The plat showed one unnumbered,

elongated parcel, shown as shaded on Appendix A, that divided Lots 8 and 9 and Lots 7 and 10 and led from the 30–foot road to Mill Creek, but the plat made no reference to any "reserved" lot.

In 1958, the Browns recorded a second plat, entitled " 'Harbor Light Beach Subdivision' Section Two," a copy of which, with identifying legends added by us, is attached as Appendix B. That plat laid out 39 numbered residential lots and two unnumbered parcels. Three of the numbered lots and the two unnumbered parcels bordered the Patuxent River. The unnumbered lot shown on Appendix B as shaded is the KLLC lot. That is the lot most relevant to this case. The other unnumbered lot is shown as hash marked. The plat showed four interior roads, one of which, Port Drive, led to the KLLC lot and thus, together with the other interior roads, provided access from the non-riparian lots to the river.

This plat was not signed by the Browns—indeed, their names did not appear on it at all—but, as noted, it contained a legend on the KLLC lot, "Area Reserved For The Use Of Lot Owners." Neither the legend nor anything else on the plat indicated *which* lot owners were intended to be benefitted—only those owning lots in Section Two or those owning lots in Section One as well.

At various times prior to September, 1960, the Browns sold five lots from Section One (Lots 14, 15, 16, 17, and 18) and one lot from Section Two (Block E, Lot 3). In September, 1960, or at some point thereafter, they conveyed all but one of the remaining numbered lots in Section One and all of the remaining lots in Section Two to Beltway Industries, Inc.[2] Included in the deed as well were (1) two described parcels, of 3.268 acres and 2.566 acres, respectively, that bordered but were not

---

**2.** Lots 1 and 2 in Block E were specifically reserved to the Browns in the September, 1960 deed. Both of those lots were included by Beltway in a Declaration of Covenants it placed on record in 1972 and in a 1976 conveyance from Beltway to Waters *et al*, however, suggesting that, at some point, they were conveyed to Beltway. No one has raised that as an issue.

part of the HLB subdivision, (2) the unnumbered parcel separating Lots 8 and 9 and 7 and 10 on the plat of Section One, which the deed referred to as a "Reserved Area on Plat of Section No. One," and (3) the two unnumbered parcels in Section Two. The "reserved" parcel in Section Two—the KLLC lot—was not separately identified in the deed but was included within the conveyance of all "roads, streets, drives, paths, parks, shore and reserved areas as shown and designated" on the plats of Sections One and Two, "subject, however, to any rights of way of record and to right of way in common to lot owners in said subdivision over the nearest street and road to public highway and to the waters of Mill Creek and the Patuxent River in said reserved areas as shown on the aforesaid plats." The deed thus appeared to convey 54 numbered lots, four identified parcels, and, along with the roads and paths, the KLLC lot in Section Two shown as reserved.

In October, 1972, Beltway recorded a Declaration of Covenants, Restrictions and Conditions covering the 54 numbered lots and the two extraneous parcels that Beltway had acquired from the Browns but which were not part of the subdivision as shown on the two plats. Beltway apparently lumped those two parcels with the 54 lots and referred to them as 56 lots, as though they were all part of the subdivision. The Declaration did not mention or include the lots previously sold by the Browns, the unidentified parcel shown on the plat of Section 1, or the two unnumbered parcels in Section Two.

The Declaration stated that the covenants were designed to make Harbor Light Beach a desirable community and to assure that every effort would be made to protect the investment of each lot owner. The covenants were said to be supplemental "to the covenants, restrictions and conditions originally placed upon the subdivision known as Harbor Light Beach if any were, in fact, so recorded." All references to "lot owner" were declared to mean "the purchaser, the party of the second part, his heirs or assigns."

Most of the covenants and restrictions contained in the Declaration concerned the use of the lots and what could be

built on them. Several more general provisions are of particular relevance to this dispute. All right, title, and interest to the streets and drives laid out on the recorded plats were expressly reserved to Beltway, subject to the ability of the lot owners to use them to access the nearby public road. Those streets and drives were declared to be private roads, and each lot owner was required to pay an annual assessment to Beltway for road maintenance. Paragraph 5 of the General Provisions—the provision most applicable here—stated:

> "DEVELOPER, present owner of the remaining 56 lots of Harbor Light Beach, desires to set up a sound basis for maintenance of the roadways and reserved areas of Harbor Light Beach. *To this end, LOT OWNERS, their heirs and assigns of the said remaining 56 lots, will pay a 1/56th share per lot of said maintenance cost until such time as all 56 remaining lots are sold, at which time the said LOT OWNERS, their heirs and assigns, will accept a 1/56th fee simple interest per lot in said roadways and reserved areas, thereby relieving DEVELOPER of all liabilities relative to said roadways and beach areas.*
>
> Until such time, LOT OWNERS agree to pay to DEVELOPER, if and when billed, a sum of not more than $20.00 per lot, per year, for use in road and reserved area maintenance."

(Emphasis added).

In ¶ 7 of the General Provisions, Beltway reserved to itself and its successors and assigns the right to enter any premises to abate the violation of a condition or the breach of a covenant, and, in ¶ 9, Beltway reserved the right to enjoin any breach or threatened breach. The final part of the Declaration provided:

> "After a majority of the lots in Section 1 and Blocks C, D, and E of Section 2 have been conveyed by DEVELOPER to LOT OWNERS, or at such other time as DEVELOPER, in its sole discretion may determine, *DEVELOPER, or its agent,* as agent for said LOT OWNERS, is authorized to cause a community protective corporation or association to

be organized for the purpose of assuring the perpetuation of Harbor Light Beach as a desirable community and the safeguarding the investment of all LOT OWNERS. The management of said organization shall be governed by its members."

(Emphasis added).

The Declaration continued that, upon the organization of such an association, all of the then lot owners agreed to become members, that one of the purposes of the association would be the promotion and enforcement of the covenants in the Declaration, and that, to that end, the lot owners, on behalf of the association, agreed to accept from the Developer an assignment of its rights, privileges, and responsibilities and "the enforcement of these Covenants, Restrictions and Conditions." Nothing in the Declaration suggested that any individual lot owner could create such an association with independent authority to enforce any of the covenants or restrictions.

Five months later, in March, 1973, Beltway recorded a Supplemental Declaration applicable to the unnumbered lot in Section One—the lot that separates Lots 8 and 9 and Lots 7 and 10. This Supplemental Declaration stated that if the Developer, in its sole discretion, chose to make access to Mill Creek available to any of Lots 7, 8, 9, 10, or 11 of Section One by utilizing the unnumbered lot for that purpose, the access would not be open to public ingress and egress but would, instead, be limited to those of the five lots to which the Developer chose to make such access available.[3]

In June, 1976, Beltway conveyed six of the numbered lots in Section One, all of the 38 previously unsold numbered lots in Section Two, the unnumbered lot in Section One that divided Lots 8 and 9 and Lots 7 and 10, the 2.566 acre parcel that bordered but was not part of the subdivision plats, and the two unnumbered parcels in Section Two to Joseph Waters, Doro-

---

**3.** It does not appear from the plat that Lots 7 or 11 would need that parcel for access, as they were riparian lots with direct access to Mill Creek. Use of the parcel may have been convenient for Lots 8, 9, and 10, however, which did not have direct access to the creek.

thy Owens, and Richard Alexander (the Waters group). The fate of the remaining lots in Section One that had been deeded to Beltway but that were not covered by this conveyance is unclear. We shall assume that they had been previously sold by Beltway. Also included in the deed to the Waters group were all of the roads, streets, drives, paths, parks, and "shore and reserved areas as shown and designated on Plats of Section One (1) and Two (2) of Harbor Light Beach Subdivision...."

The Waters group made a number of conveyances of importance here. In 1980, they conveyed to Mr. and Ms. Mychalus the six lots in Block C of Section Two plus a part of the unnumbered hash marked parcel that ran from lot 4 of Block C south to the river, thereby giving the Mychaluses direct access to the river. The part of the unnumbered parcel conveyed to the Mychaluses lay just to the west of the reserved (KLLC) lot. In October, 1982, the Harbor Light Beach (Section One) Property Owners Association, Inc. was incorporated for the purpose of maintaining and repairing the roads in Section One of the HLB subdivision. The members were all of the lot owners in Section One. In January, 1983, the Waters group conveyed to that association the three roads in Section One. It does not appear that any similar association was created for Section Two, and, at some point in 1984, the Waters group conveyed two of the roads in Section Two to the County Commissioners of Calvert County. One road was described as Port Drive, which ran from a State road to the northern edge of the KLLC lot; the other connected Port Drive to land lying to the east of the subdivision.

In 1988, the Waters group sold to Gerald and Judith Tucker most of the rest of the unnumbered parcel in Section Two bordering the river that lay south of lot 4 of Block D and west of the portion sold to the Mychaluses. The conveyance left a 30–foot roadway separating the Mychalus and Tucker properties, thus providing access to the river, through the various internal roads, for all of the lots in Section Two. In 1991, the Kobrines purchased lot 3 in Block E from existing owners. That lot bordered the reserved KLLC lot. In 1998, Metzger

purchased his lot from the existing owner. Both properties were described by reference to the recorded plat of Section Two, but neither deed said anything about the reserved KLLC lot. Finally, for our purposes, in September, 1999, KLLC purchased the reserved lot from the Waters group.

The deed to KLLC described the lot as "[a]ll that land which is shown and designated as 'AREA RESERVED FOR THE USE OF LOT OWNERS' on a plat entitled 'Harbor Light Beach Subdivision, Section Two.' " The parties expressly acknowledged that the property was not being conveyed as a building lot, that no representation was made that the property could be used as such, that the grantee did not intend to erect a residential dwelling on it, and that the property was restricted from having any type of residential dwelling on it. The conveyance was in fee simple, "subject to covenants and restrictions of record," and contained a special warranty that the grantors had not done anything to encumber the property conveyed.

Within a month after KLLC purchased the lot, the Kobrines, pursuant to a wetlands license obtained from the State Department of the Environment, installed a stone revetment along the shoreline to protect the KLLC lot from erosion. That revetment made access to the water difficult. As relations between the neighbors began to sour, in part, according to the Kobrines, because of loud parties and picnics conducted on the KLLC lot by a few of the other lot owners, the Kobrines posted a no trespassing sign on the lot.

In November, 1999, Metzger and the owners of six other lots filed suit in the Circuit Court for Calvert County against KLLC, seeking (1) a declaratory judgment that the deed to KLLC is void and that title to the KLLC lot is vested in the current owners of the 56 lots subject to the 1972 Declaration, and (2) an injunction to restrain the defendant from interfering with their use of the KLLC lot. Eventually, all of the plaintiff lot owners save Metzger dismissed their action.

In April, 2000, Metzger and two of the lot owners who had initially been co-plaintiffs incorporated an entity known as

HLB Home Owners Association, Inc. (HOA) for the purpose, among other things, of providing for the use, maintenance, and operation of the "Common Areas and Roads ... located in Harbor Light Beach Subdivision ... including any improvements and amenities located thereon." The charter language thus seemed to extend HOA to the lot owners in both Section One and Section Two, notwithstanding that an association for Section One, to which the roads in that section had been conveyed, already existed.

In July, 2000, Metzger and HOA filed a Second Amended Complaint against KLLC and the owners of the other lots in Section Two (including Metzger's erstwhile co-plaintiffs) seeking a variety of alternative declaratory and injunctive relief. They sought a declaratory judgment that (1) "the Plaintiffs and other lot owners of Harbor Light Beach" have an easement in the KLLC lot for all lawful recreational purposes, KLLC holds title to the lot in constructive trust for such recreational use, and if the plaintiffs and other lot owners do not have an easement by virtue of the recorded plat, they have a recreational easement by prescription; and (2) HOA is the duly organized representative of Harbor Light Beach lot owners, KLLC holds title to the KLLC lot in trust for the lot owners and must convey title either to HOA or, in 1/56th interests, to the 56 lot owners directly.

After trial, the Circuit Court concluded that the owners of the 56 lots in Sections One and Two of the subdivision that were sold by the Browns to Beltway had a limited express and implied recreational easement in the KLLC lot and that they were also entitled to have title to that lot conveyed to them. The express easement was based on the legend noted in the Section Two subdivision plat, the deed from the Browns to Beltway that referenced the plat and stated that the conveyance of reserved areas shown on the plat was subject to rights of way of record and to the right of way in common in the reserved areas, and the language in the 1972 Declaration. The order entered by the court declared that (1) "the lot owners of Harbor Light Beach have an easement in [the KLLC lot]," (2) the easement is for access to the river and

enjoyment of the beach located on the lot, (3) "the Plaintiffs"—presumably meaning Metzger and HOA—were authorized and directed to remove the revetment from the property at the expense of Dr. Kobrine and KLLC, (3) the sale of the KLLC lot from the Waters group to KLLC was null and void, (4) plaintiffs' counsel was to submit a judgment "transferring the [KLLC lot] to the owners of the 56 lots who purchased subsequent to the filing of the Declaration," and (5) responsibility for maintenance of the lot was transferred immediately "to the lot owners."

Those conclusions were challenged, unsuccessfully, in the Court of Special Appeals. With respect to the validity of the deed to KLLC, the appellate court held that "[t]he developers promised to convey the property to the lot owners once all 56 lots were sold," that "[t]he lot owners were entitled to rely upon the Declaration, which stated that the parcel in question would be theirs after all the lots were sold," and that "it was fair for the circuit court to use specific performance to remedy the breach of contract to convey the parcel in question to the lot owners." *Kobrine, L.L.C. v. Metzger, supra*, 151 Md.App. at 280, 824 A.2d at 1042. In reaching that conclusion, the court held that the plaintiffs were not judicially estopped from seeking that relief, that the Declaration was not too vague or ambiguous to be enforced, and that "the agreement to convey in the Declaration" did not violate the Rule Against Perpetuities. The perpetuities argument was based on the assertion that there was no assurance that the sale of all 56 lots—the condition for the alleged agreement to convey the KLLC lot—would be accomplished within a life in being plus 21 years. The court rejected that argument on the ground that the developer did not intend for there to be such a hiatus and that "the developer's intention would mandate not applying the rule." *Id.* at 287, 824 A.2d at 1046.

With respect to the easement, the appellate court concluded that it was unnecessary to consider whether an express easement had been created, as it agreed with the Circuit Court that an implied easement had been created by the general plan of development. In reaching that conclusion, the court

relied principally upon this Court's decisions in *Steuart Transp. Co. v. Ashe*, 269 Md. 74, 304 A.2d 788 (1973) and *County Commissioners v. St. Charles*, 366 Md. 426, 784 A.2d 545 (2001). The only disagreement that the appellate court had with the trial court's order was the requirement that Dr. Kobrine, who was not a party to the case, pay personally for removal of the revetment. We granted *certiorari* to review the two courts' determination that the 56 lot owners in Sections One and Two of the subdivision had a right both to title of and a recreational use easement in the KLLC lot.

## DISCUSSION

### Right to Conveyance of Title

KLLC continues to mount a multi-faceted attack on the order declaring the deed to KLLC null and void and directing that title to the lot be conveyed either to HOA or to the owners of the 56 lots covered by the 1972 Declaration. They raise the defense of judicial estoppel—that in the trial court, Metzger claimed that the Declaration constituted an actual conveyance of the KLLC lot to the other lot owners whereas on appeal he argued that it constituted merely a covenant to convey; they argue that, if treated as a covenant to convey, it violates the Rule Against Perpetuities; they contend that the Declaration does not even cover the KLLC lot; and they aver that, in any event, the provision relied upon does not constitute a covenant to convey. Their last point, which seems to have escaped the two lower courts entirely, is the telling one.

The Court of Special Appeals construed ¶ 5 of the general provisions of the Declaration as a promise "to give the reserved areas to the lot owners once all of the lots were sold"—a promise "that the parcel in question would be theirs after all the lots were sold." *Kobrine, L.L.C. v. Metzger, supra*, 151 Md.App. at 279–80, 824 A.2d at 1042. That is simply not the case.

We have quoted ¶ 5 of the general provisions in the 1972 Declaration. In order to create a sound basis for the maintenance of roadways and reserved areas, the Developer required

the 56 lot owners to pay, annually, a 1/56th share of the maintenance costs "until such time as all 56 remaining lots are sold, at which time *the said LOT OWNERS . . . will accept* a 1/56th fee simple interest per lot in said roadways and reserved areas, thereby relieving DEVELOPER of all liabilities relative to said roadways and beach areas." (Emphasis added). There is nothing in that provision that requires the developer to convey title to the roadways and reserved areas to the lot owners; it merely requires those owners to accept such a conveyance if one is tendered. That covenant to accept has significance in that, if the Developer chose to convey the roads and reserved areas, it would require the lot owners to bear the expense of maintaining them.

Apart from the very wording of the provision, which contains no covenant on the part of the Developer to do anything, the fact is that, without any protest from any of the lot owners in either Section One or Section Two, the Waters group, in at least two respects, acted in complete derogation of the existence of a covenant to convey. This is most clearly apparent from their deeding the roads in Section One to the homeowners association created in 1982 for the purpose of owning and maintaining them and by deeding the roads in Section Two to Calvert County, thereby making it quite impossible for the Waters group, or any subsequent developer, to convey those roads to the various lot owners individually. It is also implicit from how Beltway and the Waters group dealt with each of the unnumbered parcels in Section One and Section Two.

In both the 1960 deed from the Browns to Beltway and the 1976 deed from Beltway to the Waters group, the unnumbered parcel lying between Lots 8 and 9 and Lots 7 and 10 in Section One was expressly referred to as a "Reserved Area." If the lower courts' analyses were correct, that parcel also would have been subject to ¶ 5. Yet, in its Supplemental Declaration in 1973, Beltway expressly reserved the right to limit the use of that parcel to the owners of lots 7, 8, 9, 10, and 11, a clear indication that Beltway—the author of the 1972 Declaration—did not regard that "Reserved Area" as being

subject to ¶ 5. In 1980, the Waters group conveyed part of the unnumbered waterfront parcel in Section Two to the Mychaluses, and in 1988, they conveyed another part of it to the Tuckers. Although that parcel had not been formally labeled a "reserved area," that is clearly what it was. It was an unnumbered parcel shown on the plat of Section Two.

The combination of the conveyance of the roads, the Supplemental Declaration; the conveyance of most of the larger reserved parcel in Section Two to the Mychaluses and the Tuckers, and, finally, the conveyance of the KLLC lot to KLLC, all without any contemporaneous protest from any lot owner in either Section One or Section Two shows convincingly that no one regarded ¶ 5 as a covenant by the Developer, or any successor Developer, to convey any of those areas to the individual lot owners. It was, at best, an option that the Developer retained in the Declaration. The courts below erred in holding otherwise. In light of that conclusion, it is unnecessary for us to consider whether, if such a covenant existed, it would have violated the Rule Against Perpetuities.[4]

### *Express or Implied Easement*

Although, for a variety of reasons, we seriously doubt whether HOA has any standing to assert any express or implied easement in the KLLC lot, we need not resolve that doubt, as it is clear that Metzger, as a lot-owner in Section Two, has sufficient standing in that regard.[5]

---

**4.** In declining to comment on whether, if § 5 did constitute a covenant to convey, it would violate the Rule Against Perpetuities, we should not be regarded as approving in any way the notion of the Court of Special Appeals that, if the rule *did* apply, "the developer's intention would mandate not applying the rule." *Kobrine, L.L.C. v. Metzger, supra,* 151 Md.App. at 287, 824 A.2d at 1046.

**5.** In its reply brief and at oral argument, KLLC noted that Metzger had moved from the subdivision. Upon subsequent inquiry by the Court, counsel for Metzger reported that Metzger still owns the lot, that he leased it for a brief period, and that he intends to resume possession of it. Counsel for KLLC did not contest that Metzger still owns the lot but asserted that they did not have sufficient information to confirm whether he had transferred or was in the process of transferring his lot. The

The Circuit Court found that the KLLC lot was burdened by an express recreational easement arising from (1) the legend on the plat of Section Two, (2) the fact that the deed from the Browns to Beltway made reference to that plat and conveyed the previously unsold property subject to "right of way in common to lot owners in said subdivision over the nearest street and road to the public highway and to the waters of Mill Creek and the Patuxent River in said reserved areas as shown on the aforesaid plats," (3) the 1972 Declaration, and (4) the deed from Beltway to the Waters group, which also contained the "subject to" language found in the deed from the Browns to Beltway. The court found as well an implied easement from the legend on the plat of Section Two, from the deeds to individual lot owners that referenced that plat, and from the manner in which the lots were marketed. In that last regard, evidence was presented that the plat of Section Two was used in marketing the lots in that section and prospective purchasers were able to access that lot.

The Court of Special Appeals decided not to address the issue of an express easement but concluded that an implied easement was created, for the benefit of all 56 lot owners in Sections One and Two, "by the general-plan development." *Kobrine, L.L.C. v. Metzger, supra,* 151 Md.App. at 288, 824 A.2d at 1047. We find no basis for any express easement. We do believe, however, that there is a basis for a limited implied easement—limited to the benefit of the 39 numbered lots in Section Two and limited to the kind of recreational uses specified by the Circuit Court.

An easement may be created by express grant, by reservation in a conveyance of land, or by implication. In *Brehm v. Richards,* 152 Md. 126, 132, 136 A. 618, 620 (1927)

---

general rule seems to be that, where the dominant parcel is subject to a lease, as Metzger's lot now appears to be, the landlord may sue to restrain the disturbance of an easement appurtenant to the parcel if the disturbance is either permanent in nature or of such a nature that the landlord suffers damages. *See* 3 Herbert Thorndike Tiffany, THE LAW OF REAL PROPERTY, § 814 at 363 (3rd.Ed.1939); 4 Richard R. Powell, POWELL ON REAL PROPERTY, § 34.17 at 34–176–77 (2003).

and *Baltimore & H.R. Co. v. Algire*, 63 Md. 319, 320 (1885), this Court held, or at least implied, that an easement by express grant or reservation may be created only "in the mode and manner prescribed by the recording statutes." Although no words of inheritance are necessary, the instrument must contain "the names of the grantor and grantee, a description of the property sufficient to identify it with reasonable certainty, and the interest or estate intended to be granted." Maryland Code, § 4–101 of the Real Property Article. In *Dubrowin v. Schremp*, 248 Md. 166, 171, 235 A.2d 722, 724–25 (1967), we limited that requirement to rights of way created by deed and held that a right of way, otherwise sufficiently described, could validly be created by a memorandum that complied with the Statute of Frauds, *i.e.*, a writing signed by the party to be charged or that party's authorized agent. Easements by implication may be created in a variety of ways ... by prescription, the filing of plats, necessity, estoppel and implied grant or reservation. *See Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630, 635 (1984).

The ultimate source of any easement under the facts in this case, other, perhaps, than one by prescription, must be the legend, "Area Reserved For The Use Of Lot Owners," shown on the unnumbered parcel that became the KLLC lot on the plat of Section Two. In terms of an express easement, by grant or reservation, the plat is unclear in at least three respects: (1) neither the name nor the signature of the grantor appears anywhere on the plat; (2) although the servient lot is identified, the plat does not indicate *which* lot owners are intended to be benefitted—only those owning lots in Section Two or also those owning lots in Section One— thereby making both the grantees and a clear description of the dominant property impossible to identify from just the face of the document;[6] and (3) the nature of the interest

---

6. There is some indication in the record that a Section Three was later developed. If so, the question may arise, under the lower courts' holdings, whether the owners of lots in that section also would have some easement in the KLLC lot.

intended to be conveyed is entirely unclear under the circumstances of this case: *what* use may the dominant lot owners make of the servient lot?

Those uncertainties are not clarified by any of the other documents relied upon by the lower courts or by Metzger. The "subject to" language in the deeds from the Browns to Beltway and from Beltway to the Waters group references the plats of Sections One and Two and conveys all "roads, streets, drives, paths, parks, shore and reserved areas as shown and designated" on those plats, "subject, however, to any rights of way of record and to right of way in common to low owners in said subdivision *over the nearest street and road to the public highway and to the waters of Mill Creek and the Patuxent River in said reserved areas as shown on the aforesaid plats.*" (Emphasis added).

That language suffers from at least one other ambiguity. In relevant part, it reserves to lot owners a right of way over the nearest street to the waters of Mill Creek and the Patuxent River "in said reserved areas." As we indicated, there is a road in Section One that provides access to Mill Creek and there is a road in Section Two that provides access to the Patuxent River. This language says nothing, however, about what use any of the lot owners may make of any of the reserved areas that are not required in order to provide access by road to the water; nor does it explain what is meant by a street or road to the waters of Mill Creek and the Patuxent River "in said reserved areas as shown on the aforesaid plats." There is no road or street "in said reserved areas," nor are the waters of Mill Creek or the Patuxent River "in said reserved areas."

The 1976 Declaration imposes restrictions on most of the lots in the subdivision, but imposes no restrictions on the KLLC lot, which is not included in the Declaration, presumably because most of the restrictions deal with the kinds of improvements that may be put on the lots and the KLLC lot was not regarded as a buildable lot. The only provision in the Declaration that possibly could have affected the KLLC lot

was the language in ¶ 5 of the general provisions that required each of the lot owners to contribute a 1/56th share of the cost of maintenance of the roads and reserved areas and, should the Developer ever decide to convey any of those roads or areas, to accept a 1/56th fee simple interest in them. Nothing in the Declaration clarifies which lot owners may make use of the KLLC lot or what use any of them may make of it.

We turn, then, to the deeds to the individual lot owners. None of the deeds, for either Section One or Section Two lots, say anything about the KLLC lot or purport to convey any describable easement in that lot. The Section One deeds reference the Section One plat, which, of course, is silent as to the KLLC lot; the Section Two deeds reference the Section Two plat; both merely convey the lot being sold, together with buildings and improvements thereon and all "rights, alleys, ways, waters, privileges, appurtenances and advantages to the same belonging or anywise appertaining." The only additional evidence in this regard relating to Section One lots are letters from the Section One Homeowners Association and from various lot owners in Section One making clear that they have no interest in the KLLC lot or in the litigation. These uncertainties preclude any finding of an easement in the KLLC lot by express grant or reservation. There is no way to tell, strictly from the documents, what kind of easement was being conveyed or to whom.

There was no finding in this case of an implied recreational easement in the KLLC lot by prescription, necessity, or estoppel. The only finding below was an easement created through implied grant or reservation. In *Boucher v. Boyer, supra,* 301 Md. at 688, 484 A.2d at 635, we observed that "[a]n implied easement is based on the presumed intention of the parties at the time of the grant or reservation as disclosed from the surrounding circumstances rather than on the language of the deed," and that, "[a]s a result, courts often refer to extraneous factors to ascertain the intention of the parties." *See also Koch v. Strathmeyer,* 357 Md. 193, 198, 742 A.2d 946, 948 (1999); *Calvert Joint v. Snider,* 373 Md. 18, 39, 816 A.2d 854, 866 (2003). In this case, the "surrounding circumstances"

are bound up in the various documents discussed in connection with the posited express easement—the plat of Section Two, the deeds from the Browns to Beltway and from Beltway to the Waters group, the 1972 Declaration, and the individual deeds to lot owners in Section Two—along with the manner in which Section Two lots were marketed.

Most of the cases in which implied grants have been found have involved subdivision plats showing roads or alleys that abut the lots. We confirmed in *Koch v. Strathmeyer, supra,* 357 Md. 193, 199, 742 A.2d 946, 949, the well-settled rule that "when a property owner subdivides property and makes or adopts a plat designating lots as bordering streets, and then sells any of those lots with reference to the plat, an implied easement of way 'passes from the grantor to the grantee . . . over the street contiguous to the property sold.'" (quoting *Mullan v. Hochman,* 157 Md. 213, 220–21, 145 A. 554, 557 (1929)). *See also Boucher v. Boyer, supra,* 301 Md. at 689, 484 A.2d at 635–36; *Atl. Const. Corp. v. Shadburn,* 216 Md. 44, 51–52, 139 A.2d 339, 343 (1958).

Those cases are somewhat limiting, in that the implied easement extends only to the abutting roadway and permits use of that roadway only until it reaches some other street or public way. *Koch v. Strathmeyer, supra,* 357 Md. at 199, 742 A.2d at 949, citing *Hawley v. Baltimore,* 33 Md. 270, 280 (1870).[7] A more expansive rule has been applied with respect to waterfront subdivisions. This was first made clear in *Williams Realty Co. v. Robey,* 175 Md. 532, 2 A.2d 683 (1938). Through an unrecorded plat, a developer created a waterfront community. The plat showed an area between a thirty-foot road and the water labeled "Community Beach and Park." That plat was used in marketing the lots, and assurances were given to the buyers that the area would be kept for the use of the lot owners in the community. A short time later, a second

---

**7.** In *Koch,* the road in question ran from a public waterway to a county road, and we held that the implied easement permitted lot owners to use the road in either direction—to the waterway and to the county road.

plat was prepared showing the same area as open space but without any words designating its use. Although that plat was recorded, the first plat continued to be used in marketing the lots. About seven years later, a third plat was recorded that showed the open area divided into lots.

The litigation began when the owner of the waterfront area opened it for public use, renting it out as a public resort and night club, and the owner of a lot just across the road from the area sued for injunctive relief. This Court affirmed the grant of such relief, noting that "[t]he relation of lots in a water front settlement to the water differs from that of abutting lots to a city square" in that access to the water is the essential purpose of the subdivision and the purchase of lots in it. *Id.* at 539, 2 A.2d at 686. We added that "when a buyer is persuaded ... by the assurances of restricted facilities in a community beach lying immediately across his front road or street, the advantages appear with sufficient clearness and certainty to have been sold to him as an incident, and in a court of equity repudiation must be prevented by injunction." *Id.* at 540, 2 A.2d at 686. Although it seems that only the one lot owner sought the injunctive relief, that relief presumably benefitted all of the other lot owners as well.

A similar result was reached in *Klein v. Dove*, 205 Md. 285, 107 A.2d 82 (1954), also involving a waterfront community. Some of the lots had direct water frontage; others, like that of the defendant, fronted on a beach area that bordered the water; and still others, including that of the plaintiff, were interior lots. The recorded plat showed a ten-foot right-of-way running along side the defendant's lot that connected an interior road to the beach area. When the defendant obstructed that right-of-way, the plaintiff sued for injunctive relief. Although, unlike the situation in *Williams Realty Co.*, there was no legend on the plat showing the beach area as a community area, the Court nonetheless concluded that "there is no readily perceptible reason for the ten-foot right of way between what appears to be the main road of the development and the [beach] area except to give the owners or occupants of

interior lots on this waterfront development access to boating, bathing, swimming and fishing." *Id.* at 291, 107 A.2d at 85.

■ The recorded plat of Section Two, though insufficient to establish an express grant or reservation, does clearly indicate an intent by the Browns to reserve the KLLC lot for some use by some lot owners. The legend deliberately placed on that lot could have no other purpose.

With respect to the intended beneficiaries, there is nothing in this record to indicate an intent that lot owners in Section One have any right of use in that lot. They all had access to Mill Creek, both by a road laid out in the plat of Section One and potentially by the reserved lot lying between Lots 8 and 9 and Lots 7 and 10, and there is no indication, either from the recorded plat of Section One or from any other document, that the owners in that section were to have any right of use of the KLLC lot in Section Two. The lot owners in Section One have eschewed any interest in the KLLC lot. It seems evident, therefore, that the only lot owners intended to be benefitted by the use of the KLLC lot were those in Section Two. As to the nature and scope of the use, we believe that the Circuit Court was entirely correct in finding that the use was limited to accessing the river for normal waterfront activities, as in *Klein v. Dove*—boating, swimming, fishing.

The subsequent deeds are consistent with an implied easement so restricted. The deeds refer to a right of way in common over the streets "to the waters of Mill Creek and the Patuxent River," indicating an intent merely to permit the lot owners to traverse the KLLC lot from Port Drive to the river and not to use that lot for other purposes, such as picnics and parties. We note in this regard that Metzger and HOA filed no cross-appeal from the Circuit Court's order and no cross-petition for *certiorari* from the Court of Special Appeals decision, so the limitations placed by the Circuit Court on the use of the KLLC property have not been challenged by them.

### Removal of Revetment

Finally, KLLC protests that part of the Circuit Court's order permitting Metzger to remove the revetment installed

by KLLC or the Kobrines, arguing that such removal would violate certain critical area regulations. The Court of Special Appeals concluded that the Circuit Court ruling was necessarily subject to "all applicable laws relating to the environment." *Kobrine, L.L.C. v. Metzger, supra,* 151 Md.App. at 294, 824 A.2d at 1050. We agree with that conclusion, and thus do not interpret the Circuit Court order as permitting Metzger or anyone else to remove the revetment in contravention of any law controlling such removal.

## CONCLUSION

For the reasons noted, we conclude that (1) the lot owners in Section One of the HLB subdivision have no title interest and no easement, express or implied, in the KLLC lot; (2) the lot owners in Section Two have no title interest and no express easement in that lot; but (3) the lot owners in Section Two do have an implied easement to use the KLLC lot for access from Port Drive to the Patuxent River for the limited kinds of activities set forth in the Circuit Court's order of September 6, 2002. We agree with the Court of Special Appeals that, because the Kobrines individually were not made parties to this case, no costs, either of the litigation or for any necessary work on the KLLC lot may be assessed against them. We shall vacate the judgment of the Court of Special Appeals and remand the case to that court with instructions to vacate the judgment of the Circuit Court and remand to that court with instructions to enter a proper judgment in conformance with these conclusions. In fashioning that judgment, the court may take into account that the Developer had reserved the right to assess the lot owners for the cost of maintaining the reserved areas and determine whether and in what proportion those owners may be required to contribute to the cost of maintaining their easement in the KLLC lot. We express no opinion on that matter. *See,* however, *Drolsum v. Luzuriaga,* 93 Md.App. 1, 611 A.2d 116 (1992); RESTATEMENT (THIRD) OF THE LAW OF PROPERTY: SERVITUDES § 4.13; Jon W. Bruce and

James W. Ely, Jr., THE LAW OF EASEMENTS AND LICENSES IN LAND, § 8.34.[8]

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE JUDGMENT OF CIRCUIT COURT FOR CALVERT COUNTY AND REMAND TO THAT COURT WITH INSTRUCTIONS TO ENTER NEW JUDGMENT IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID 75% BY RESPONDENTS AND 25% BY PETITIONERS.

---

**8.** In reaching our conclusion that the lot owners in Section Two have an implied recreational use easement in the KLLC lot, we have not relied on cases such as *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855 (1955) and *Steuart Transp. Co. v. Ashe*, 269 Md. 74, 304 A.2d 788 (1973), which deal more with implied negative reciprocal easements. This case does not involve that kind of easement.

### APPENDIX A
Plat of Section One
Harbor Light Beach

Concurring in part and Dissenting in part Opinion by HARRELL, J., which BELL, C.J. and BATTAGLIA, J., join.

Although I agree with most of the Majority's reasoning and conclusions, I respectfully dissent with regard to the Majority's recognition of a "limited implied easement—limited to the benefit of the 39 numbered lots in Section Two and limited to the kind of recreational uses specified by the Circuit Court." Maj. op. at 635, 846 A.2d 412. In my view, it is improper to conclude that Metzger, for himself or as the stalking horse for

the other lot owners in Section Two, is entitled to an implied easement when he admitted that he did not rely on either the Declaration or the plat when purchasing his lot in the subdivision. Prior to the Majority's opinion here, no reported case in Maryland ever has recognized an implied easement where the moving litigant did not rely on—much less read—the documents creating the general scheme upon which the alleged implied easement, as found by a court, is based.

In *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 197 A. 580 (1938), we iterated the standard of proof applicable to uniform general plans of development and the enforcement of restrictions on the use of the land subject to the general plan:

[c]ovenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as part of a uniform general scheme of development.

*McKenrick,* 174 Md. at 128, 197 A. at 584–85. There is no clear and satisfactory proof in this case that access to the disputed reserved parcel is needed for a right of way. The overwhelming majority of our cases in which an implied grant of an implied easement has been found to exist involved subdivision plats showing roads or alleys that are used as right of ways to service abutting lots. Maj. op. at 639–40, 846 A.2d 414–15. The deeds for both the Kobrine lot and the Metzger lot described their respective properties by reference to the recorded plat of Section Two, but neither deed said anything about the reserved parcel. In addition, the Declaration expressly defines which specific lots and parcels are subject to its terms and restrictions. The reserved parcel is unambiguously omitted from the Declaration. To find an implied easement by implied grant in this case, therefore, the majority relies on the two *sui generis* waterfront subdivision cases of *Williams* and *Klein* that recognize a more expansive

rule when there is a disputed area between subdivision lot owners and the water. *Williams Realty Co. v. Robey,* 175 Md. 532, 2 A.2d 683 (1938); *Klein v. Dove,* 205 Md. 285, 107 A.2d 82 (1954).

In *Williams,* the property at issue was a beach contiguous to the water. As a result, the rule regarding implied easements over roadways was irrelevant. Based upon the elements of equitable estoppel, this Court affirmed an injunction to prevent the repudiation of verbal and written assurances made to the lot purchasers. *Williams,* 175 Md. at 540, 2 A.2d at 686. Testimony was presented in the trial court establishing that the original grantees bought their property in reliance upon an unrecorded plat shown to them by the sales agent. This unrecorded plat contained a "Community Beach and Park," which the sales agent represented would be kept open for the exclusive use of lot owners in the community. The deeds also made reference to the "community beach." This Court relied on a specific finding that, by a preponderance of the testimony, the lot owners "were induced to buy their lot upon assurances in the first plat, and verbally, confirmed by the reference in their deed to the 'Community Beach,' lying immediately across the road in front of their lot, that they were securing rights to the enjoyment of the open space from the road to the water, in conjunction with other lot owners and such persons as they might invite." *Williams,* 175 Md. at 536, 2 A.2d at 685. We concluded, therefore, that access to the water was the reason the owners purchased the lots in that community and, therefore, equity prevented the "repudiation" of such assurances, and the owners of the beach were enjoined from creating a public resort on the land. *Williams,* 175 Md. at 540, 2 A.2d at 686.

In *Klein,* the interior lots did not abut the right of way at issue and, therefore, the Court looked beyond the general principles governing implied easements over contiguous roadways in order to understand the intent of the common grantor. The *Klein* Court highlighted specific reliance in its rationale: "It seems clear that the plaintiffs bought their lots in reliance upon the recorded plat of 'Wild Rose Shores.' " *Klein,* 205 Md. at 291, 107 A.2d at 85. The original grantees relied upon

the recorded plat in which the original owner expressly reserved ownership and control of all of the streets and roads within the development against dedication to the public and "for the exclusive and mutual use and benefit of the owners of the lots abutting on said Streets and Roads." *Klein,* 205 Md. at 289, 107 A.2d at 84. The right of way in question ran from the "main road" of the development to the "lake area," all of which was clearly designated on the recorded plat. *Klein,* 205 Md. at 291, 107 A.2d at 85. Although the "lake area" was not designated as a "community beach" on the recorded plat, this Court found that there was no other purpose for the 10 foot right of way other than to provide owners of the interior lots "access to boating, bathing, swimming, and fishing. *Klein,* 205 Md. at 291, 107 A.2d at 85. *See also Koch v. Strathmeyer,* 357 Md. 193, 201–03, 742 A.2d 946, 950–51 (1999) (examining the history and scope of Maryland cases applying the implied easement doctrine, and summarizing the role of reliance in *Williams* and *Klein* ).

At trial in the present case, Metzger testified that he did not rely on either the Declaration or the subdivision plat when he purchased his home:

"[KOBRINE'S ATTORNEY]: When you bought your home you never got a copy of the declaration, you never read it and you never relied on it, correct?

"[METZGER]: Relied on it for what?

"[KOBRINE'S ATTORNEY]: For anything? You didn't even receive a copy of it?

"[METZGER]: No, I didn't. I didn't.

\*　　\*　　\*

"[KOBRINE'S ATTORNEY]: And also you didn't have this copy of the plat shown as Plaintiff's Exhibit 15, did you?

"[METZGER]: I don't recall ever getting that, no. Until after.

"[KOBRINE'S ATTORNEY]: So you didn't rely on the plat or the declaration, right?

"[METZGER]: Again, rely on it for what?

"[KOBRINE'S ATTORNEY]: For anything?

"[METZGER]: Oh, for anything? No." [9]

There is no reliance in this case and, therefore, no need, nor basis in fact, for an implied right of way across the reserved parcel. This Court stated in *Williams,* 175 Md. at 539, 2 A.2d at 686, that there is a unique relationship between a waterfront development and the water, because "[t]here is naturally a ... dependence, if indeed we should not say that access to the water is an essential, for in that access lies the purpose of the settlement and the purchase of the lots in it." The majority justifies an implied right of way here by reasoning that because the deeds in Section Two "refer to a right-of-way in common over the streets 'to the waters of Mill Creek and the Patuxent River,' [this indicates] an intent merely to permit the lot owners to traverse the KLLC lot from Port Drive to the river and not to use that lot for other purposes, such as picnics and parties." Maj. op. at 641, 846 A.2d 415. The reserved parcel is not a street, and I cannot agree that because the property deeds refer to a right of way over the streets of the subdivision that this somehow proves the original intent of the developer to create a right of way over the reserved parcel. In *Williams,* all of the deeds specifically referenced the "Community Beach." *Williams,* 175 Md. at 536, 2 A.2d at 684–85. In *Klein,* the recorded plat governing the development depicted a 10–foot right of way to the lake, and bore a legend which granted the "exclusive and mutual use and benefit" of the roads to the adjoining lot owners. *Klein,* 205 Md. at 289, 107 A.2d at 84. Unlike *Williams,* Metzger's deed does not contain any reference to the reserved parcel, much less to any right of way over it. And, unlike *Klein,* the plat in this case does not indicate a right of way

---

**9.** The 1972 Declaration did not mention the reserved parcel. Thus, there was no way for an original grantee in Section Two from the Browns to rely on it. As regards the 1958 subdivision plat, there is no evidence pointed to in the briefs or record extract that the original grantee of lot 8 in Section Two (Beltway Industries, Inc.), which ultimately Metzger, following its recordation, acquired, relied on the 1958 subdivision plat at the time it acquired lot 8.

across the reserved parcel. Metzger is effectively suing, in an individual capacity, for both ownership and use of the reserved parcel; yet, there is ample access to the water over the existing subdivision streets and there is no reason for the majority to create by implication what is essentially a private, limited recreation area for Section Two owners (none of whom, save Metzger, are parties) on the reserved parcel.

I would require proof of reliance by Metzger upon either the subdivision plat or declaration before implying an easement upon the reserved parcel. Metzger had no such reliance when he bought his lot in the subdivision. *See, e.g., Dalton v. Real Estate & Improvement Co. of Baltimore City,* 201 Md. 34, 92 A.2d 585 (1952) ("Since the parties have not relied on rights accruing by implied grant or reservation, and since the plat and survey accompanying the deed of partition did not show Creek Road, we will assume, without deciding, that no easement arose or was recognized by the partition deed."); *Tusher v. Gabrielsen,* 68 Cal.App.4th 131, 80 Cal.Rptr.2d 126, 133 (1998) ("The rule allowing for such an easement is based on the implied intent of the grantor and upon an estoppel resulting from the buyer's reliance on the map showing the streets or other common areas at the time of purchase. Therefore, an easement will not be implied in favor of the buyer ... if there is no reference to a map, or if there is no reliance by the purchaser upon the map.") (citations omitted). Accordingly, I would reverse outright the judgments of the Court of Special Appeals and the Circuit Court for Calvert County and remand with directions to the Circuit Court to enter a declaratory judgment, consistent with as much of the Majority's opinion as I agree with and with this opinion, in favor of KLLC and deny Metzger's request for an injunction.

Chief Judge BELL and Judge BATTAGLIA have authorized me to state that they join in this opinion.