32 A.3d 88

**USA CARTAGE LEASING, LLC**

v.

**Todd A. BAER, et al.**

**No. 1797, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Nov. 30, 2011.

144

148

**150**

G. Randall Whittenberger (Miles & Stockbridge PC, on the brief), Frederick, MD, for Appellant.

James W. Stone (Miller, Oliver, Stone & Divelbiss, on the brief), Hagerstown, MD, for Appellee.

Panel: ELLEN L. HOLLANDER,* KEHOE, and HOTTEN, JJ.

KEHOE, J.

This appeal involves an easement dispute between two adjoining landowners: USA Cartage Leasing, LLC ("Cartage"), appellant, and Todd A. Baer, appellee. Their properties (the "Cartage Parcel" and the "Baer Parcel," respectively) abut Governor Lane Boulevard in Washington County. Edwin B. Glesner, Jr. and Rebecca A. Glesner (the "Glesners"), who are also parties to the case,[1] are predecessors in title to both Cartage and Baer.

---

* Ellen L. Hollander, J., participated in the hearing and conference of this case and contributed to the drafting of this opinion while an active member of this Court, but resigned from the Court of Special Appeals prior to its filing.

1. The Glesners have not filed briefs in this Court.

■ After earlier granting Baer's motion for summary judgment as to the existence of an easement across the Cartage parcel, the Circuit Court for Washington County entered a judgment, which it certified as final for purposes of appeal, declaring that Baer had a right-of-way [2] over a portion of the Cartage Parcel, establishing a precise location for the right-of-way and enjoining Cartage from interfering with Baer's use of it. This appeal followed.

Cartage presents eight issues, which we have condensed and rephrased as four questions. In addition, we must consider a preliminary question, not raised by the parties, as to our own jurisdiction to consider the appeal.[3] Accordingly, we shall consider the following questions, in this order:

1. Is the declaratory judgment appealable, either as an interlocutory order or as a permissible exercise of the circuit court's discretion under Maryland Rule 2–602(b)?

2. Did the purported easement over Cartage's land fail for lack of sufficient description and lack of agreement as to location?

3. Did the circuit court err by using the balancing analysis developed in implied easements by necessity cases in order to locate the purported express easement on the ground?

4. Did the circuit court err in granting summary judgment as to Cartage's defenses of estoppel, abandonment, and adverse possession?

5. Did the circuit court err or abuse its discretion in identifying a specific location for the easement across the Cartage parcel?

We will decide that the appeal is properly before us. We will explain why in Part I of this opinion. In Part II, we set forth the appropriate standards of review. In Part III, we

---

2. Generally, "the terms 'easement' and 'right-of-way' are regarded as synonymous." *Miller v. Kirkpatrick*, 377 Md. 335, 349, 833 A.2d 536 (2003). We shall use the terms interchangeably here.

3. We raised the question of appealability at oral argument and permitted the parties to file supplemental briefs on this issue.

discuss why the circuit court correctly decided that the easement was not void because of an inadequate description or the lack of an agreement as to its location. In Part IV, we conclude that a balancing analysis, similar to that employed by courts in implied easement cases, as an appropriate means to specify a precise location for the right-of-way in this case. However, as we will explain in Part V, the circuit court erred in entering summary judgment in light of disputed material facts concerning Cartage's adverse possession defense. In light of this holding, it is unnecessary for us to decide whether the circuit court correctly applied the balancing analysis to determine an exact location for the easement but we will provide guidance to the court and the parties as to this issue on remand in Part VI. Therefore, we will vacate the judgment of the circuit court and remand the case for further proceedings.

## BACKGROUND

Our statement of facts is drawn from what is undisputed in the parties' pleadings and summary judgment papers, taken in the light most favorable to Cartage, as the non-moving party.

The Glesners acquired what are now the two properties at issue in 1984. At that time, the parcel was a single 5.26–acre lot, located at the southeasterly intersection of State Route 68 and Governor Lane Boulevard. The northerly boundary[4] of the parcel abutted Governor Lane Boulevard; the southerly boundary backed up to railroad tracks owned by Conrail. The property was bounded on the west by Maryland Route 68 and on the east by another property.

In 1985, the Glesners subdivided the lot into two roughly rectangular parcels. At the time, they retained one parcel (now owned by Cartage) and conveyed the other (now owned by Baer) to M.K.S. Development. Of central importance to this appeal, the deed to M.K.S. also granted it an easement

---

4. For simplicity's sake, we will refer only to the cardinal points of the compass in describing the property; Governor Lane Boulevard actually runs from the northeast to the southwest.

over the Cartage Parcel, described as "a non-exclusive right-of-way 25 feet in width, leading from the existing entrance from Governor Lane Boulevard, shown on the Plat of the above-referenced property, recorded at Plat folio 1806, to the property hereby conveyed." The deed did not otherwise describe the easement.

The plat referred to in the deed was prepared in November 1984 by Fox & Associates, Inc. (the "Fox Plat"), which we reproduce (not to scale) on the following page. The Fox Plat showed an "Exist[ing] Entrance" to the Cartage Parcel from Governor Lane Boulevard, near the dividing line between the Cartage Parcel and the Baer Parcel. Just on the other side of the dividing line between the two parcels, the Fox Plat also showed a "Prop[osed] Entrance" to the Baer Parcel from Governor Lane Boulevard, of similar dimensions to the "Exist[ing] Entrance" on the Cartage Parcel. However, the Fox Plat did not mention or depict the easement. **We reproduce the plat (not to scale and with language added to identify the parcels).**

The Baer Parcel changed hands several times before it came to be owned by Baer. In November 1988, M.K.S. conveyed the property to Patrick Grunberg and Lee U. Michael.

This deed expressly conveyed the "non-exclusive right-of-way 25 feet in width" over the Cartage Parcel, using the description taken verbatim from the Glesner/M.K.S. deed. Just over a month later, Michael deeded his interest in the Baer Parcel to Grunberg. This deed did not expressly mention the right-of-way.

In November 1992, Grunberg conveyed the Baer Parcel to Donald L. Baer and Joan H. Baer ("Mr. and Mrs. Baer"), who are Todd Baer's parents. Once again, the deed did not refer to a right-of-way over the Cartage Parcel.

In early 2008, two additional deeds pertaining to the Baer Parcel were filed. The first was a confirmatory deed from Grunberg and the Personal Representative of the Estate of Lee U. Michael.[5] This deed recounted that the deed from M.K.S. to Grunberg and Michael had conveyed the Baer Parcel along with the right-of-way and, although the deeds from Michael to Grunberg and from Grunberg to the Baers did not expressly refer to the right of way, the grantors of those deeds intended to convey to their respective grantees all rights appertaining to the Baer Parcel, including the right-of-way. The deed reconveyed the Baer Parcel to the Baers with a description that included the description of the right-of-way using language identical to that in the Glesner/M.K.S. deed.

The second deed, both in date of execution and filing, was a deed by which Mr. and Mrs. Baer conveyed the Baer Parcel to their son, Todd A. Baer. This deed included a reference to the right-of-way.

In the meantime, the Cartage Parcel changed hands only once. The Glesners conveyed that lot to Cartage by a deed dated April 7, 1995 (*i.e.*, after Grunberg had conveyed the Baer Parcel to the Baers in 1992, but before the confirmatory deed and the deed from Mr. and Mrs. Baer to Todd Baer were filed in 2008). The deed to Cartage made no mention of the right-of-way over the Cartage Parcel.

---

5. Mr. Michael died in September 2007.

Cartage is a commercial trucking business. While the record is not entirely clear as to all of the specifics, at one time Cartage leased the property from the Glesners. After the lease terminated, there was a period of time, perhaps four years, before Cartage purchased the property. The Cartage Parcel is developed for commercial use, with at least one building on it, although the date of the building's construction is uncertain. The portion of the Cartage Parcel that is immediately adjacent to the Baer Parcel is a gravel parking lot' for trucks and other vehicles. The Baer Parcel, in contrast, is undeveloped.

On August 4, 2008, Baer filed a Complaint for Declaratory Judgment and Other Relief against Cartage, which contained two counts. The first count sought a declaratory judgment that Baer "holds a legally valid and effective right-of-way over [Cartage's] Property." Although Baer conceded that "[t]he location of [Baer's] Right–of–Way is not specified in the language of the deeds in the chain of title from the Glesners to [Baer], and has not been determined by custom or usage by [Baer] or his predecessors in title," he nevertheless alleged that the Cartage Parcel "was and is now subject to [Baer's] right of way." As an exhibit to his complaint, Baer attached a plat prepared by Davis, Renn & Associates, Inc. (the "Davis–Renn Plat"), showing a proposed location of the easement, E54, which he asserted was "the least burdensome location for a 25–foot right of way capable of providing reasonable commercial ingress and egress from the 'existing entrance' shown on the [Fox] Plat to [the Baer] Property." Baer asked the court to "[d]eclare that the proper location of [Baer's] Right–of–Way is shown on [the Davis–Renn Plat] or, in the alternative, determine a reasonable location for [Baer's] Right–of–Way."

The second count of Baer's complaint alleged that Cartage, "without just cause or excuse, has interfered with and continues to interfere with [Baer's] lawful use of enjoyment of [Baer's] Right–of–Way." He sought an injunction prohibiting Cartage from such interference, as well as damages of $250,000.

In its answer, Cartage denied any liability and raised, among others, the defenses of waiver, laches, estoppel, abandonment, and adverse possession. Cartage filed a one-count counterclaim seeking to quiet title to the Cartage Parcel, free of Baer's asserted right-of-way. In addition, Cartage filed a third party complaint for damages and related relief against the Glesners, alleging that the Glesners breached a warranty of title contained in the Glesner/Cartage deed.

On July 13, 2009, Baer filed a motion for summary judgment. After recounting the deed transactions we have reviewed, Baer asserted that the right-of-way is part of the chains of title to both parcels. Baer acknowledged that the location of the right-of-way had not been previously established. Nevertheless, he maintained that he "has not abandoned the Right–of–Way, and USA Cartage has provided no evidence of abandonment sufficient to meet the standard required by Maryland law." Moreover, he contended that Cartage could not adduce evidence sufficient to establish a claim for adverse possession. To support these allegations, Baer provided excerpts of a deposition of Ralph Richmond, a member of USA Cartage Leasing, LLC. Richmond's deposition testimony was a substantial basis for the circuit court's decision to grant summary judgment in Baer's favor. We will summarize the most relevant portions.

Richmond testified that Cartage began leasing the Cartage Parcel beginning in 1986 (*i.e.,* shortly after the Glesners subdivided their property and sold the Baer Parcel to M.K.S. in 1985). At that time, there was a line of "old telephone poles" already in place, laid flat on the ground end-to-end, running parallel with the boundary line with the Baer Parcel. The line of telephone poles ran from the rear property line separating the Cartage Parcel from the adjacent railroad property to within a short distance of the front property line at Governor Lane Boulevard. The poles covered "the entire area ... that you could come into with a vehicle," and their purpose was "to keep vehicles from going over them" in situations in which one would "back[ a] trailer against it or cars going up, or trucks going into—over the area." Rich-

mond was not aware of any vehicle ever going over the poles, and there were no vehicles in Cartage's possession that "would be able to go over them." He opined that "there would be no way to go over the poles." When asked if there would be any way to go "around the poles," he responded: "I don't know that. Again it depends on the vehicle, I guess.... I mean you would not take your—like a car[ ] and do that." He indicated that "whatever they're capable of blocking today, they've been capable of blocking continuously for twenty years." Richmond recalled that, shortly after Cartage purchased the property, the company moved the line of poles closer to the boundary with the Baer Parcel, and "put gravel in," so as to create "extra space for parking." Aside from that relocation, the poles had "[n]ever," to Richmond's knowledge, been "moved or disturbed ... during [Cartage's] ownership of the property." [6]

In December 1994, after it signed a contract to buy the Cartage Parcel from the Glesners, Cartage applied for a variance to county setback requirements so that it could expand the existing building. Both Richmond and Donald Baer (Baer's father) participated in the hearing before the county zoning board.

According to Richmond, Mr. Baer initially opposed Cartage's variance request. At some point in the hearing, it was suggested that the variance would be granted if Cartage

---

**6.** Excerpts of Richmond's deposition were attached to Baer's motion for summary judgment but the entire deposition is not in the record. At the hearing on the summary judgment motion, Baer's counsel quoted from other portions of the deposition. According to Baer's counsel, Richmond testified at his deposition that Cartage rented the Cartage Parcel, beginning " 'around July of 1986,' " for " 'about three or four years,' " until " 'somewhere into 1990/91. I don't know. I just don't remember how long it was.' " As noted, Cartage purchased the Cartage Parcel in 1995. Thus, Baer's counsel asserted at the hearing, without contradiction, that there was a gap of "probably four or five years," between the end of Cartage's lease in 1990 or 1991 and its purchase of the property in 1995, during which Cartage was not in possession of the property, either as owner or tenant. Later in the hearing, Cartage's counsel agreed that there was a "gap in time," during which Cartage "leased for a while and then ... came back and bought" the Cartage Parcel, but observed that for "[t]he time in between, it's conceded that it was never used as a right of way there."

would agree to plant a row of trees along its boundary with the Baer Parcel. Richmond could not recall specifically whether Mr. Baer, or a member of the zoning board, first made the suggestion but, once the suggestion was made "[t]hey just came to an agreement on it at that point, and then we were allowed to have the variance. [Mr. Baer] was good that if we would ... completely block off trees here, and everybody was good with that." When asked whether it was Richmond's "position ... that Donald Baer insisted on a particular type of screen," Richmond stated: "That is not my position." Richmond also did not recall whether Mr. Baer "insisted on screening being put along the entire property boundary." Richmond did not remember the "exact words" of the discussion that took place at the hearing, but stated, "all I remember is that [Mr. Baer] finally came across that he would go with the board[']s decision to allow us to have that variance."

Approximately six months after the hearing, Cartage planted a line of "roughly" twenty Leyland Cypress evergreen trees, "[e]nough to completely cover [the property] line," within "two feet inside of our property line." Thereafter, as mentioned, the line of telephone poles was moved closer to the boundary line between the Cartage Parcel and the Baer Parcel, such that the poles were situated "just in front" of the tree line. The immediately adjacent area on the Cartage Parcel became "gravel parking for trucks." The trees have remained in place throughout the proceedings in the circuit court.

According to Baer's summary judgment motion, Richmond's deposition testimony demonstrated that Donald Baer's insistence on a barrier between the properties came in the context of the elder Baer's opposition to Cartage's variance request, and that Donald Baer's objections were related to the capacity of the Cartage Parcel to handle an increased volume of truck traffic and a concern "that any storage areas that USA Cartage might install on the property ... may become an eyesore." Therefore, reasoned Baer, "Donald Baer's testimony at the variance request hearing ... was clearly related to

his concerns regarding protecting his real estate investment, and not for the purpose of abandoning the Right–of–Way."

Baer further argued that Richmond's testimony that there were "telephone poles laying end to end along the boundary line" between two properties did not establish adverse possession, because Cartage could not show that the telephone poles had continuously and completely blocked the right-of-way for a twenty-year period. Moreover, Baer asserted that Richmond's testimony demonstrated that the poles were not placed with the intention of blocking use of the right-of-way, but rather were placed so as to " 'keep vehicles from going over them' when trucks would back up to the poles and park on USA Cartage's property." (Quoting Richmond's deposition testimony).

Cartage filed a multi-pronged defense to the motion. First, it argued that the attempted grant of the easement failed *ab initio* because: there was no evidence to show the intended location of the easement; the court could not determine a "location that never existed"; and "this is not a case requesting a way by necessity." Second, Cartage contended that, even if "an easement had ever formed," Baer's predecessors in title had abandoned it. Further, Cartage suggested that the fact that "the ambiguous right-of-way language" was "dropped from the deed chain" constituted clear evidence of acquiescence in the loss of the easement. Finally, Cartage maintained that the easement, if it existed at all, had been extinguished through adverse possession by Cartage and its predecessor's-in-title. As exhibits to its opposition, Cartage attached an affidavit of Richmond and excerpts from a deposition of Donald Baer. We will now summarize the most relevant portions of each.

In his affidavit, Richmond stated: "There is no indication on the USA Cartage parcel that a right-of-way exists, or has ever existed." Further, he averred:

The landscape has always evidenced the opposite, that there has been no visible use of the parcel as a right-of-way. No paving has occurred. Trees and grass existed prior to

1995, and further trees were planted as a landscape barrier thereafter, which exist to this day. Railroad ties [7] laid end-to-end across the area were utilized as backstops for trucks, preventing any vehicular traffic across since 1986. Large trucks have been parked daily for many years within that area now claimed by [Baer] for a right-of-way.

In his deposition, Donald Baer testified that, until his son Todd Baer realized that there was a possible right-of-way "in about 2006," neither he nor his wife and co-tenant Joan Baer had been aware that any right to an easement over the Cartage Parcel existed. Indeed, during their ownership of the Baer Parcel, they "never used an easement or a right-of-way to get to [their] property over the USA Cartage parcel," nor had they seen anyone else do so. They never had any discussions with Richmond or the Glesners regarding a right-of-way, nor did they ever complain to Richmond or the Glesners about obstruction of the right-of-way.

While Donald Baer did not remember the details of the variance hearing at which the tree screen was proposed, he did not recall objecting to the proposal, or objecting to the placement of the trees or the "parking configuration that was then put in by USA Cartage."

When asked whether he "approved of the trees being placed in there," he responded: "Well, it didn't bother me so I guess I did."

While the summary judgment motion was pending, Cartage, with the Glesner's consent, filed a consent motion for a separate trial of its third-party claims against them. The circuit court granted the motion on August 10, 2009.

The summary judgment motion was heard the next day, August 11, 2009. At the conclusion of the hearing, the circuit court granted Baer's motion for summary judgment. At the

---

7. The record does not clarify why Richmond referred to the barrier as made up of "telephone poles" in his deposition, but as "railroad ties" in his affidavit. No photographs or other exhibits illustrating the barrier are in the record.

outset of his remarks, the trial judge recited the language from the deed to M.K.S. that created the purported easement, and stated:

> I don't know why it was contemplated that Mr. Baer's predecessor in title ever needed a right of way over the servient estate. They clearly have plenty of road frontage.... [C]learly, it's not an easement by necessity in any way, shape or form. And there's no evidence to show why it was put there ... or for that matter why Mr. Baer needs it because he has other access.
>
> But I don't think those facts [are] relevant. I'll assume for the sake of motion in the light most favorable to [Cartage] that this was done arbitrarily or maybe even ... inadvertently....

These considerations notwithstanding, the court observed that the easement "is a matter of record," and "clearly should have been brought up in a title search of either property." The court noted that, even though "subsequent deeds dropped this specific language[,] .... [i]t doesn't have to be specifically mentioned. That's what title searches are for."

Citing *Rogers v. P–M Hunter's Ridge, LLC,* 407 Md. 712, 967 A.2d 807 (2009), the court determined that the language in the deed "does not create a specific easement of right of way but a general easement of right of way.... The general right of way isn't extinguished under the *Rogers* holding simply because it isn't specifically described where it exists or there's not other evidence like an existing trail...."

In the court's view, "one way to determine" the location of a general easement "is by usage and custom." However, the court stated:

> [a]nother way would just be consistent with the language of the cases that deal with right of way of necessity where it's the least obtrusive. Where it would be most convenient. Where it would ... impact on the servient ... estate the least.

The court opined that the easement should be located such that it would cause "very minimal intrusion to the USA

Cartage Parcel.... It should go somehow in a direct and convenient way from the existing entrance to ... the Baer Parcel."

The court also rejected Cartage's abandonment and estoppel defenses. It stated that there was no evidence that Donald Baer "ever intended to abandon the right of way. Simply ... not knowing you have a right doesn't mean you've intended to abandon the right." In the court's view, "acquiescing to trees being planted or railroad ties or telephone poles being placed there, [while] not knowing about the right of way is not evidence of intent to abandon the right of way." Further, the court rejected the claim that the parking of trucks on the Cartage Parcel was relevant to the abandonment claim, stating: "Trucks aren't fixtures. They can come and go." "For the same reason," the court said, "there's not estoppel."

The court decided that Cartage's adverse possession claim "also fails." It explained:

There was never any evidence that USA Cartage was intending to make this their property by putting insurmountable barriers up. Telephone poles, railroad ties are not permanent fixtures that can't be moved. Trucks that are parked there every day, obviously can be moved to some other location.

* * *

There's never been any claim of right that USA Cartage has. They had the right to use it, too. He owns the fee simple property underneath the right of way. He can use it in any way that's not inconsistent with [the] right of way. Because the right of way can be place and these ... telephone poles and barriers can easily be put ... aside.

* * *

Mr. Richmond's affidavit talks about the telephone poles or the barriers.... But in his deposition he does say that these poles have been there for more than twenty years.... So, it was, in effect, the purposes to keep the vehicles from going over them. But that doesn't necessarily mean it was

the intent to block the vehicles from ever going over. It was just indicating where the vehicles were supposed to stop.

Accordingly, the court concluded that it would grant summary judgment. The court then observed that the grant of summary judgment "still leaves the issue of where the right of way reasonably should be located." After discussing procedural options with counsel, the court took testimony on behalf of Baer regarding the location, and held the record open for Cartage to develop an alternative suggestion for the location of the easement.

Baer then presented the testimony of Stephen Cvijanovich, a project manager with Davis, Renn, and Associates, who had prepared the Davis–Renn Plat. The court accepted Cvijanovich as an expert "on the reasonableness of commercial right of ways."

Cvijanovich testified that, after a site visit to the properties with Baer in January or February 2006, he "tried to determine what would be the ... least offensive easement over the lands of USA Cartage to allow ingress/egress to Mr. Baer's property." According to Cvijanovich, the Davis–Renn Plat showed a proposed right-of-way with a width of 25 feet and an inside turning radius of 25 feet. He explained: "Once we enter the USA Cartage Parcel via this easement, we immediately turn to the right and head towards Mr. Baer's property. [T]his is ... probably one of the least offensive easement locations that could be selected." In his view, there was no other potential location with an acceptable turning radius that would be "less offensive or less onerous to the USA Cartage Parcel." **We set out the Davis–Renn plat (not to scale):**

The day after the hearing, on August 12, 2009, the court entered a written order granting Baer's motion for summary judgment, and entered judgment in favor of Baer on his complaint, on Cartage's counterclaim, and on Cartage's "asserted defenses of abandonment and adverse possession."

On August 20, 2009, Cartage filed its proposal for the location of the right-of way, which consisted of a copy of the Fox Plat, on which Cartage had shaded a proposed location for the right-of-way that was entirely in the shoulder of Governor Lane Boulevard, and led to the "Prop[osed] Entrance" to the Baer Parcel delineated on the plat. **We set out Cartage's proposal (again, not to scale):**

Cartage also submitted an affidavit of Richmond, who asserted that the proposed location would allow Baer "reasonable access to his land" and would be "less burdensome [than] the right-of-way proposed at trial by [Baer]." [8]

In response, Baer argued that Cartage failed to present a plausible alternative location which raised any issue of fact as to the proper location of the right-of-way. Baer pointed out that the entire shaded area on Cartage's proposal lay within

---

8. Cartage stated that it was "cautiously submit[ting] this *alternative* 'placement' drawing, while expressly reserving its right to appeal the Court's earlier ruling as to summary judgment and its decision that the law allows the Court to 'place' or 'locate' an easement in these circumstances...."

the public right-of-way for Governor Lane Boulevard. He attached an affidavit from Cvijanovich which stated that use of the shaded area for access to the Baer Parcel would result in unsafe turning motions and, in addition, would violate the "design and regulatory standards and requirements governing any proposed means of ingress and egress" to and from the Baer Parcel.

On September 10, 2009, the court entered two orders. The first rejected Cartage's proposed location for the right-of-way. The second order was titled "Final Order Declaring Rights of Parties" (the "Declaratory Order"), which recited the facts and procedural history, and noted that Baer sought a declaratory judgment, injunctive relief, and monetary damages,[9] and also sought to quiet title. The Declaratory Order included the following provisions:

> **ORDERED, ADJUDGED, AND DECREED,** that [Baer] now holds and enjoys a legally valid and effective express easement or right-of-way over the [Cartage] Property for the purposes of ingress and egress to the [Baer] Property (the "Plaintiff's Right-of-Way"), being 25 feet in width and leading from the Existing Entrance on Governor Lane Boulevard, as shown on the [Fox] Plat, to the [Baer] Property, as set forth in the Glesners to M.K.S. Development deed; and it is further

> **ORDERED, ADJUDGED, AND DECREED,** that the Plaintiff's Right-of-Way has not been abandoned or extinguished by adverse possession; and it is further

> **ORDERED, ADJUDGED, AND DECREED,** that the proper location of the Plaintiff's Right-of-Way be and hereby is determined to be the Plaintiff's Proposed Location thereof, as depicted on the attached [Davis–Renn Plat], because the Plaintiff's Proposed Location is the location which is the least burdensome to [the Cartage] property and which, at the same time, provides [Baer] with reasonable access to his Property; and it is further

---

9. The circuit court stated that Baer "abandoned his claim for monetary damages."

**ORDERED, ADJUDGED, AND DECREED,** that [Cartage] be and hereby is permanently enjoined from interfering with or disturbing [Baer's] lawful use and enjoyment of his Right-of-Way over [the Cartage] Property, including [Baer's] improvement thereof in a manner suitable for vehicular ingress and egress and the removal of any present obstructions or impediments thereto; and it is further

**ORDERED, ADJUDGED, AND DECREED,** that [Cartage's] Counterclaim be and hereby is dismissed. . . .

On September 21, 2009, Cartage filed a motion to revise the court's orders to make them final for purposes of appeal pursuant to Maryland Rule 2–602(b), and to continue proceedings on the third party claim until the appeal was decided. After an exchange of pleadings in which the Glesners expressly conceded that they would be bound by the outcome of this appeal but which are otherwise not relevant to the issues before us, the court issued an order granting Cartage's motion, "finding that there is no just reason for delay." The order stated that "the orders of this Court dated and entered September 10, 2009 are revised from this date to be final for purposes of appeal" However, the court did not set forth any other reasons in the order for its certification of finality. Additionally, the court continued the third-party action "pending the resolution of any appeal from this final order."

## DISCUSSION

### I. Appellate Jurisdiction

■ The third-party claim between Cartage and the Glesners has yet to be resolved. It is a "long-standing bedrock rule of appellate jurisdiction, practice, and procedure that, unless otherwise provided by law, the right to seek appellate review . . . ordinarily must await the entry of a final judgment that disposes of *all claims against all parties.*" *Silbersack v. AC & S, Inc.,* 402 Md. 673, 678, 938 A.2d 855 (2008) (emphasis added) (citations omitted). This rule has exceptions and two are relevant here. First, a party may note an interlocutory appeal from certain types of non-final orders, where statutori-

ly authorized by Mᴅ. Cᴏᴅᴇ Aɴɴ., Cᴛs. & Jᴜᴅ. Pʀᴏᴄ. ("C.J.") § 12–303 (1973, 2006 Repl.Vol.); and, second, a party may appeal from an order that has been certified by the trial court as final under Rule 2–602(b). We will examine each possible source of jurisdiction.

■ The Declaratory Order is an appealable interlocutory order under C.J. § 12–303(3)(i), which authorizes interlocutory appeal of an order "[g]ranting or dissolving an injunction." The Declaratory Order contains an injunctive provision, enjoining Cartage from "interfering with or disturbing [Baer's] lawful use and enjoyment of his Right–of–Way." The grant of injunctive relief was predicated on the circuit court's determination of the validity and location of Baer's easement. Because that determination was the basis for the injunction, we are empowered to review that determination on appeal. *See County Comm'rs for Carroll County v. Forty West Builders, Inc.,* 178 Md.App. 328, 941 A.2d 1181, *cert. denied,* 405 Md. 63, 949 A.2d 652 (2008) (appellate review of a contractual question was proper under C.J. § 12–303(3)(i) because the grant of injunctive relief was predicated on the circuit court's finding on the contract issue); *see also Evans v. State,* 396 Md. 256, 327–50, 914 A.2d 25 (2006); *Schisler v. State,* 394 Md. 519, 907 A.2d 175 (2006); *Ettridge v. TSI Group, Inc.,* 314 Md. 32, 548 A.2d 813 (1988); *Bd. of Trustees of the State Colleges of Md. v. Sherman,* 280 Md. 373, 373 A.2d 626 (1977); *Hashem v. Taheri,* 82 Md.App. 269, 571 A.2d 837 (1990) (cases where courts have reviewed interlocutory injunctive orders pursuant to C.J. § 12–303(3)(i), not merely to discern the propriety of injunctive relief, but also to address the underlying substantive bases for the injunctions).

■ We also conclude that the circuit court did not abuse its discretion in certifying the Declaratory Order as final for purposes of appeal. We are aware that "the discretion to enter judgment under Rule 2–602(b) . . . [is] to be reserved for the 'very infrequent harsh case.'" *Silbersack,* 402 Md. at 679, 938 A.2d 855. Our task is complicated where, as here, the circuit court does not provide its reasons for certifying its

judgment as final. Under those circumstances, we can afford no deference to the trial court's decision, *Miller Metal Fabrication, Inc. v. Wall,* 415 Md. 210, 227, 999 A.2d 1006 (2010), and the certification order "only will be a valid exercise of the trial court's discretion if the record clearly demonstrates" to the appellate court " 'the existence of any hardship or unfairness' sufficient to 'justify discretionary departure from the usual rule establishing the time for appeal.' " *Id.* at 228, 999 A.2d 1006 (quoting *Diener Enter. v. Miller,* 266 Md. 551, 555, 295 A.2d 470 (1972)).[10]

■ There are two threshold conditions that must be satisfied before we can review the trial court's exercise of discretion. First, the order must completely dispose of an entire claim of one or more parties. *Planning Bd. of Howard County v. Mortimer,* 310 Md. 639, 651, 530 A.2d 1237 (1987). Second, the circuit court must, in fact, enter a certification order as provided by the rule; that is, the court must expressly determine in "a written order that there is no just reason for delay" and the order must direct the clerk to enter judgment under Rule 2–601. *Tharp v. Disabled Am. Veterans Dep't,* 121 Md.App. 548, 558, 710 A.2d 378 (1998).

■ *Miller Metal* sets out the factors we must consider in deciding whether a particular case satisfies Rule 2–602(b)'s requirement that there be "no just reason" to delay entry of a final judgment. The Court noted that "[c]ourts commonly find 'no just reason for delay' when delaying an appeal will have a significant adverse economic impact on the party requesting certification." *Id.* at 229, 999 A.2d 1006 (citation omitted). However, the Court explained that there are countervailing factors: multiple appeals involving the same issues, the expense of repeated appellate litigation, delay in the timely resolution of the remaining issues in the case, disruption to the orderly operation of the trial court and the possibility that " 'partial rulings by the appellate court may do more

---

**10.** The Court of Appeals' opinion in *Miller Metal* was filed on July 23, 2010. The circuit court Rule 2–602(b)'s order at issue in this case was filed on September 21, 2009.

to confuse than clarify the unresolved issues.'" *Id.* (quoting *Lead Indus. Ass'n,* 386 Md. at 25–26, 871 A.2d 545). In addition, the Court said: "Certification is also improper when the pending claim, or claims, and the claim subject to appeal 'arise from a nexus of fact and law so intertwined that if we decide the one now, we may nonetheless face many of the same questions in determining the other later.'" *Miller Metal,* 415 Md. at 229, 999 A.2d 1006 (quoting *Bldg. Indus. Ass'n v. Babbitt,* 161 F.3d 740, 745 (D.C.Cir.1998)).

■ The factors identified in *Miller Metal* must be assessed in the context of "the interests of judicial economy and the strong policy against piecemeal review." *Canterbury Riding Condominium v. Chesapeake Investors, Inc.,* 66 Md.App. 635, 651, 505 A.2d 858 (1986). The focus of the "judicial economy" aspect of the analysis is on appellate, not trial, courts. *Tharp,* 121 Md.App. at 566, 710 A.2d 378. We turn to the case before us.

■ We first note that the circuit court's order satisfies the threshold requirements for Rule 2–602(b) certification. The Declaratory Order fully and finally resolved whether Baer is entitled to an easement over Cartage's land and the precise location of that easement. The circuit court can afford no further relief to Baer; the only remaining issues for determination in the circuit court proceeding involve Cartage's claim against the Glesners on its breach of warranty, indemnity, and contribution claims. Also, the circuit court complied with the literal dictates of Rule 2–602(b), by "expressly determin[ing] in a written order that there is no just reason for delay" and granting certification, albeit without providing its reasons for doing so.

■ We next consider whether this is an "infrequent harsh case" in which "the record clearly demonstrates 'the existence of any hardship or unfairness' sufficient to 'justify discretionary departure from the usual rule establishing the time for appeal.'" *Miller Metal,* 415 Md. at 228–29, 999 A.2d 1006 (quoting *Diener,* 266 Md. at 555, 295 A.2d 470). We conclude that it is.

First, delaying an appeal will have a significant adverse economic impact upon the parties. Without certification, the Glesners will be forced, perhaps needlessly, to spend time and money to defend against Cartage's claim, and Cartage will also expend additional resources litigating the issue. While significant, this consideration (or some variant on it) is present in every case in which a Rule 2–602(b) order is entered. Much more important, in our view, is that, until an appellate resolution, Baer is permitted, perhaps unjustly, to cross a portion of Cartage's property. This is an affront to " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property,' " namely, Cartage's "right to exclude others." *Weems v. County Comm'rs,* 397 Md. 606, 619, 919 A.2d 77 (2007) (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)).

The other factors identified in *Miller Metal* point towards certification. There is little, if any, chance that there will be repeated appeals involving the same issues because the Glesners have agreed to be bound by the results of this proceeding. The remaining issues to be tried are factually and legally distinct from Baer's right to an easement. We are not confronted by an inextricably intertwined "nexus of fact and law" making repeated appellate review of the same issues likely or the possibility that "partial rulings by the appellate court may do more to confuse than clarify" the remaining claims.

Considerations of appellate judicial economy militate in favor of certification. There is scant " 'possibility that the need for review might be mooted by future developments in the [trial] court.' " *Canterbury Riding Condo.,* 66 Md.App. at 653, 505 A.2d 858 (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2659 at 106). To the contrary, our immediate determination of the appeal may moot the need for further proceedings in the circuit court; and reaching the merits of this appeal will not "require us to determine questions that are still before the trial court." *Id.* at 654, 505 A.2d 858.

In sum, our independent review of the record discloses that there is " 'hardship or unfairness' sufficient to 'justify discretionary departure from the usual rule establishing the time for appeal,' " *Miller Metal,* 415 Md. at 228, 999 A.2d 1006 (citation omitted), and the relevant factors, including the judicial economy of the appellate courts, favor certification. Accordingly, we discern no abuse of discretion in the circuit court's Rule 2–602(b) certification.

We turn to the merits of the appeal.

## II. Standards of Review

We will be applying more than one standard of review because the matters before us were resolved by the circuit court in part by way of summary judgment, and in part by way of a bench trial on the limited issue of the proper location of the right-of-way.

■ The circuit court resolved at the summary judgment stage the questions of whether the right-of-way was a valid easement; whether the easement was defeated by Cartage's defenses of abandonment, estoppel, or adverse possession; and whether the court could locate the easement by use of the equitable balancing analysis applicable to implied easements by necessity. We review those legal determinations under a *de novo* standard. *Myers v. Kayhoe,* 391 Md. 188, 203, 892 A.2d 520 (2006).

■ Maryland Rule 2–501(f) sets forth the standard to be applied by the circuit court in considering a summary judgment motion: "The court shall enter judgment in favor of or against the moving party if the [summary judgment] motion and response show that there is no genuine dispute of material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." But, "if there is a genuine dispute as to any material fact, summary judgment is improper." *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 294, 936 A.2d 343 (2007).

Moreover, if the material facts are " 'susceptible of more than one inference,' " the nonmoving party is " 'entitled to the inferences most favorable to his contentions.' " *Id.* (citation omitted). A material fact is " 'a fact the resolution of which will somehow affect the outcome of the case.' " *Barbre v. Pope,* 402 Md. 157, 171–72, 935 A.2d 699 (2007) (citation omitted). On appeal, we "review independently the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law," and we "review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-plead facts against the moving party." *Tyler v. City of College Park,* 415 Md. 475, 498–99, 3 A.3d 421 (2010) (citations omitted).

### III. Was the Easement Void as a Matter of Law?

Cartage asserts that the circuit court erred in granting summary judgment to Baer because the easement was legally unenforceable. To understand the parties' contentions, it is necessary to review briefly certain aspects of the law regarding easements.

" 'An easement is broadly defined as a nonpossessory interest in the real property of another....' " *Rogers v. P-M Hunter's Ridge, supra,* 407 Md. at 729, 967 A.2d 807 (quoting *Boucher v. Boyer,* 301 Md. 679, 688, 484 A.2d 630 (1984)). " '[A]n easement involves primarily the privilege of doing a certain class of act on, or to the detriment, of another's land, or a right against another that he refrain from doing a certain class of act on or in connection with his own land....' " *Rau v. Collins,* 167 Md.App. 176, 185, 891 A.2d 1175 (2006) (citation omitted).

"An easement may be created by express grant, by reservation in a conveyance of land, or by implication." *Kobrine, L.L.C. v. Metzger,* 380 Md. 620, 635, 846 A.2d 403 (2004). An express easement, whether by grant or reservation, must be created by a written memorandum that satisfies

the Statute of Frauds; and, as we shall explore in greater detail in our discussion, a "right[ ] of way created by deed" must satisfy " 'the mode and manner prescribed by the recording statutes.' " *Id.* at 636, 846 A.2d 403 (citations omitted).

An express easement can be either general or specific. *Rogers,* 407 Md. at 731, 967 A.2d 807. An easement is specific "when its location is easily discernible, such as from a metes and bounds description, a plat map, or a call." [11] *Id.* On the other hand, "[a]n easement is reserved in general terms, when it is clear from the intentions of the parties that an easement has been created, but without a precise location." *Id.* The *Rogers* Court elaborated, *id.* at 732, 967 A.2d 807:

> If ... the easement is reserved in general terms only, an ambiguity regarding the location of the easement exists, and we look to the surrounding circumstances, including subsequent agreements and conduct of parties, which may evidence the parties' intent.

In contrast to express easements, easements by implication " 'may be created in a variety of ways, such as by prescription, necessity, the filing of plats, estoppel and implied grant or reservation where a quasi-easement has existed while the two tracts are one.' " *Id.* at 730, 967 A.2d 807 (quoting *Boucher,* 301 Md. at 688, 484 A.2d 630).

The easement at issue in this case, if it exists at all, is an express easement; however, some of the principles of law pertaining to implied easements are relevant because, at Baer's urging, the circuit court relied upon easement-by-necessity cases in determining the location of the purported express easement.

An easement-by-necessity, which is a particular type of easement by implication, arises where a parcel is "landlocked" by other land that was originally held by a common grantor, such that the only way to reach a public road

---

11. The *Rogers* Court explained that, in the context of a deed, a "call" is " '[a] landmark designating a property boundary.' " 407 Md. at 731 n. 12, 967 A.2d 807 (citation omitted).

is by crossing adjacent property. *See Sharp v. Downey,* 197 Md.App. 123, 167, 13 A.3d 1 (2010). "Necessity" to reach a public way is a defining characteristic of an implied easement-by-necessity. "[T]he court will not recognize a way of necessity if another road to the public highway can be made without unreasonable expense, even though the other road may be much less convenient." *Condry v. Laurie,* 184 Md. 317, 322, 41 A.2d 66 (1945).

 Easements by necessity are " 'based upon public policy, which is favorable to full utilization of land and the presumption that parties do not intend to render land unfit for occupancy.' " *Stansbury v. MDR Dev., L.L.C.,* 390 Md. 476, 488, 889 A.2d 403 (2006) (citation omitted); *Sharp,* 197 Md. App. at 167, 13 A.3d 1.

 Discussing how to locate implied easements by necessity, the *Stansbury* Court explained, 390 Md. at 485 n. 5, 889 A.2d 403:

Technically an easement by necessity exists by reason of the facts and circumstances present in a situation. It exists without a court order. It exists by operation of law. When disputes arise as to its existence, however, a court action is the proper way to resolve the disputes. What a court does is to affirm (or not) that an easement by necessity already exists. The court does not "create" or "establish" such an easement. In some circumstances—if an easement by necessity is determined to be in existence—a court may "locate" that pre-existing easement at a particular location.

Maryland courts have held that, in order to determine the location of an easement-by-necessity, a court must perform an equitable balancing analysis, whereby the " 'way of necessity should be located so as to be the least onerous to the owner of the servient estate while, at the same time, being of reasonable convenience to the owner of the dominant estate.' " *Sharp,* 197 Md.App. at 178–79, 13 A.3d 1 (citation omitted); *see Hancock v. Henderson,* 236 Md. 98, 105–06, 202 A.2d 599 (1964) (remanding for location of an implied easement-by-necessity that "will be fair to both sides," and explaining that,

if the parties cannot "agree upon a way satisfactory to each," then "the court itself should exercise jurisdiction in locating an adequate right of way over the servient tenement in a manner so as to permit ingress and egress of vehicular traffic, but also in a manner least burdensome to the servient tenement."); *see also Stair v. Miller,* 52 Md.App. 108, 111, 447 A.2d 109 (1982); *Michael v. Needham,* 39 Md.App. 271, 281, 384 A.2d 473 (1978); *Johnson v. Robinson,* 26 Md.App. 568, 582, 338 A.2d 88 (1975).

Here, the circuit court expressly applied this balancing analysis in locating the purported right-of-way. It stated from the bench that it could locate the easement "consistent with the language of the cases that deal with right of way by necessity," and declared, in its Declaratory Order, that the right-of-way was at the location proposed by Baer, "because [Baer's] Proposed Location is the location which is the least burdensome to [the Cartage] property and which, at the same time, provides [Baer] with reasonable access to his Property." We turn now to the parties' contentions.

▆▆▆▆ Cartage contends that the purported easement was invalid, as a matter of law, because the "easement language ... failed to provide a description of the easement sufficient to identify such right-of-way on the ground with reasonable certainty, [and because] it entirely failed to identify its location at all." [12] In this connection, Cartage cites MD.

---

12. The easement's validity is not affected by the absence of language referring to it in the Glesner/Cartage deed or in the *mesne* deeds in Baer's chain of title. "[W]henever it appears from a fair construction of a deed that it was the purpose of the parties to create or reserve an easement in the property conveyed for the benefit of other land owned by the grantor ... such a right is deemed to be appurtenant to the land of the grantor and binding on that conveyed to the grantee; and the right thus created or reserved will pass to all subsequent owners of the land to which it is appurtenant." *Greenwalt v. McCardell,* 178 Md. 132, 136–37, 12 A.2d 522 (1940).

The rule in Maryland is that " 'one is bound by every express encumbrance on his property which he could have found in the records,' " even if it is not in the direct chain of title. *Steuart Transp. Co. v. Ashe,* 269 Md. 74, 95, 304 A.2d 788 (1973) (citation omitted). The Court has acknowledged that in some cases, this stringent rule of

CODE ANN., REAL PROP. § 4–101(a)(1) (2010 Repl.Vol., 2010 Supp.) ("R.P."), which provides: "Any deed containing the names of the grantor and grantee, *a description of the property sufficient to identify it with reasonable certainty,* and the interest or estate intended to be granted, is sufficient, if executed, acknowledged, and, where required, recorded." (Cartage's emphasis.) Looking to the easement language in the deed from the Glesners to M.K.S., Cartage argues that it fails under R.P. § 4–101.

According to Cartage, the language of R.P. § 4–101(a)(1) is consistent with over a century of Maryland common law providing that, in its words, "[e]very conveyance must either on its face, or by words of reference, give to the subject intended to be conveyed, such a description as to identify it. If it be land it must be such as to afford the means of locating it." *Neel v. Hughes,* 10 G. & J. 7, 10 (Md.1838); *see, e.g., Kobrine, supra,* 380 Md. at 635–36, 846 A.2d 403.

The deed language at issue in this case purported to grant "a non-exclusive right-of-way 25 feet in width, leading from the existing entrance from Governor Lane Boulevard, shown on the [Fox] Plat ..., to the property hereby conveyed." Neither the deed nor the Fox Plat gives any indication where the right-of-way enters the Baer Parcel, nor does it delineate the path the right-of-way takes across the Cartage Parcel to reach the Baer Parcel. Although the "existing entrance" is shown on the Fox Plat, there was no plat or metes and bounds description showing the right-of-way itself. Cartage asserts: "No surveyor could take the language of the deed (or the plat to which it refers) and place the purported easement on the ground."

Cartage acknowledges that Maryland courts have stated: " 'Where a way is granted without fixing its location, but there is a way already located at the time of the grant, such way will

---

constructive notice may appear harsh, but "[h]arsh or not, the rule is well established in this State." *Id.* at 96, 304 A.2d 788. *See Lowes v. Carter,* 124 Md. 678, 685–86, 93 A. 216 (1915); *Beins v. Oden,* 155 Md.App. 237, 243–44, 843 A.2d 147 (2004).

be held to be the location of the way granted unless a contrary intention appears.' " *Weems, supra,* 397 Md. at 615, 919 A.2d 77 (*quoting Sibbel v. Fitch,* 182 Md. 323, 326–27, 34 A.2d 773 (1943)) (quotation marks omitted). However, Cartage maintains that this principle does not apply here, because the parties agree that there was never a "right-of-way existing on the ground," either at the time the Glesners conveyed the Baer Parcel to M.K.S., or at any time since.

Cartage also recognizes that there is ample case law in Maryland to support the proposition that an easement is not invalid merely because it is conveyed in general, rather than specific, terms. The rule in Maryland is:

> [A]fter the location of the right of way which has been granted in general terms has been defined and fixed by the owners of the dominant and servient tenements by user in a particular location over a long period of time, it becomes as definitely established as if the grant or reservation had so located it by metes and bounds and the location of the right of way as thus defined can only be changed by agreement of the owners of the dominant and servient tenements.

*Sibbel,* 182 Md. at 327, 34 A.2d 773; *see also, Rogers,* 407 Md. at 736–37, 967 A.2d 807; *Weems,* 397 Md. at 615–16, 919 A.2d 77; *Amabile v. Winkles,* 276 Md. 234, 241, 347 A.2d 212 (1975) ("an imprecisely described easement may be precisely located by user").

Cartage contends that "[t]he higher courts have not in these several cases yet attempted to harmonize how the common law can provide exceptions" to what Cartage sees as the unyielding statutory requirements of R.P. § 4–101. Cartage "does not concede these seeming exceptions are statutorily permissible," and maintains that, "to the extent a 'general easement' does not provide a description of the property sufficient to identify it with reasonable certainty, it violates the statutory requirements...." We do not agree.

We begin by noting that, as the Court of Appeals reiterated in *Kobrine, supra,* 380 Md. 620, 846 A.2d 403, "rights of way created by deed," such as the purported right-of-way in this

case, must satisfy the " 'mode and manner prescribed by the recording statutes.' " *Id.* at 635–36, 846 A.2d 403 (citing *Dubrowin v. Schremp,* 248 Md. 166, 171, 235 A.2d 722 (1967); *Brehm v. Richards,* 152 Md. 126, 132, 136 A. 618 (1927); and *Baltimore and Hanover R.R. Co. v. Algire,* 63 Md. 319, 320 (1885)). This necessitates conformance to R.P. § 4–101, which requires that a valid deed state "the names of the grantor and grantee, *a description of the property sufficient to identify it with reasonable certainty,* and the interest or estate intended to be granted." (Emphasis added.)

However, if we were to accept Cartage's interpretation of § 4–101, general easements would be effectively prohibited because a grant or reservation of a general easement, by definition, does not describe the right-of-way so as to locate it with "reasonable certainty." We therefore conclude that the purpose of the statute is fulfilled when the description is sufficient to identify, with reasonable certainty, the servient estate, as opposed the specific location of the right-of-way across it.

Moreover, Cartage's position is inconsistent with several Maryland cases that endorse the concept that a general easement can be located through evidence of acts or agreements of the parties occurring *subsequent* to the grant of the easement. *See, e.g., Rogers,* 407 Md. at 732, 967 A.2d 807; *Weems,* 397 Md. at 615–16, 919 A.2d 77; *Amabile,* 276 Md. at 241, 347 A.2d 212; *Taylor,* 247 Md. at 453, 231 A.2d 697; *Hancock,* 236 Md. at 101–02, 202 A.2d 599; *Sibbel,* 182 Md. at 327, 34 A.2d 773; *Needham,* 39 Md.App. at 280–81, 384 A.2d 473. Although no such subsequent acts or agreements occurred in this case, the strong support for the principle that an easement may be located based on acts and agreements *subsequent* to the grant, strongly implies that, as a matter of logic, an easement is not void *ab initio* simply because it is described in general terms; if all general easements were void from their inception, logically, they could not be located by

evidence arising *subsequent* to their creation.[13]

■ Moreover, we find support in the RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES (2000) ("Third Restatement")[14] for the notion that recordation statutes merely require the specific location of the burdened property, not the specific location of the easement. The Third Restatement provides:

> The instrument [by which a servitude is created] must identify the parties . . ., it must describe the burdened estate, and it must set forth the nature of the servitude, or the essential terms of the obligation. *Although the burdened estate must be described, it is not necessary to describe the location of the servitude within the burdened estate.* If the location is not described, the servitude is located under the rules stated in [Third Restatement] § 4.8.

Third Restatement, § 2.7, cmt. f at 118 (emphasis added).

R.P. § 4–101 does require some degree of specificity in describing the location of an easement and there are Maryland cases in which the description of an easement has been tested against the metric of R.P. § 4–101, or its substantively analogous statutory predecessors.

In *Kelly v. Nagle*, 150 Md. 125, 132 A. 587 (1926), the Court considered a purported easement over a parcel of property " 'on which there is located a spring which is about one hundred fifty (150) feet from [a particular] public road. . . .' " *Id.* at 128, 132 A. 587 (quoting deed). The deed of easement

---

**13.** We decline Cartage's implicit invitation to overrule the *Kobrine* line of cases as inconsistent with R.P. § 4–101. Even if we agreed with Cartage that the cases are fundamentally at odds with the statute (and, as we shall explain, we do not), the cases represent controlling authority decided by the Court of Appeals. This Court "does not have the option of disregarding Court of Appeals' decisions that have not been overruled, no matter how old the precedent may be." *Johns Hopkins Hospital v. Correia*, 174 Md.App. 359, 382, 921 A.2d 837 (2007).

**14.** The Third Restatement classifies several categories of nonpossessory interests in real property (easements, profits, and covenants) under the umbrella heading of "servitudes." *See* Third Restatement ch. 1 & § 1.1 at 6–8.

identified the servient property by reference to a description in an earlier deed, and granted to a neighboring landowner " 'an easement and right, use and privilege' " to install " 'a water pipe, not exceeding three-quarters of an inch in diameter, from the said spring to the lands of [the neighbor] so that the [neighbor] may enjoy the use of such water from said spring as she may need on her said property.' " *Id.* (quoting deed). The deed also granted to the neighbor and her heirs and assigns " 'the right ... of ingress and egress over and upon the lands of the [grantor] for the purpose of keeping in repair the pipe as aforesaid.' " *Id.* (quoting deed). The easement language did not specify the precise path the pipe was to take, the path of the ingress/egress easement, nor the precise location on the shared border of the properties at which the pipe easement and the right-of-way would cross. Nevertheless, the Court held that this "plain and unequivocal grant," was "in full conformity with the requirements of the statute" (then codified at MD. ANN.CODE art. 21, § 9 (1924)), and "particularly describ[ed] the thing [ (the easement) ] conveyed." *Kelly,* 150 Md. at 134–36, 132 A. 587.

More recently, in *Potomac Electric Power Co. v. Classic Community Corp.,* 382 Md. 581, 856 A.2d 660 (2004), although the Court determined that it "need not address" whether a 1931 "right-of-way card" formed an easement, *id.* at 590, 856 A.2d 660, the Court opined in *dicta* that if the card created an easement, it "would have been an easement by express grant," and "would have" satisfied the "minimal requirement[ ]" of " 'a description of the property sufficient to identify it with reasonable certainty.' " *Id.* at 589 n. 5, 856 A.2d 660 (citation omitted). The "right-of-way card," which was a form release that the electrical utility PEPCO had obtained from a customer, granted PEPCO

"the right to construct, operate and maintain lines for the transmission and distribution of electricity, ... upon the [customer's] property ... situated in Montgomery County, State of Md., and more particularly described as Travilah Road, Travilah, Md. and upon and along such roads, streets or highways adjoining the said property; and to make such

extensions therefrom as are necessary to distribute electric service; to permit the attachment of the wires of any other company or person . . . ; to erect and set the necessary guy and brace poles and anchors and to attach thereto and to trees the necessary guy wires."

*Id.* at 586, 856 A.2d 660 (quoting right-of-way card). The right-of-way card listed five electrical poles, by serial number, that PEPCO intended to erect, but did not describe in any further detail the servient property, or the locations at which the " 'poles, cables, wires, and fixtures' " would be placed. *Id.*

*PEPCO* and *Kelly* contrast, to some extent, with *State Roads Commission v. Preston,* 226 Md. 443, 450–52, 174 A.2d 61 (1961), in which the Court concluded that subsequent action by the owner of the dominant estate could not be used to establish, nor identify the location of, a drainage easement where uncontested parol evidence showed that the grantors did not intend to grant such an easement and the option agreement, and the plat associated with it, were ambiguous as to the drainage easement's location and whether it would affect the grantor's property or property across the highway.

The leading Maryland case upon which Cartage relies is *McDonough v. Roland Park Co.,* 189 Md. 659, 57 A.2d 279 (1948). In that case, a remote grantor executed a deed that conveyed a large tract of land, " '[r]eserving therefrom the graveyard situated upon said above described parcel of ground the same to be fifty feet square and to be used only as a burial place by the [grantor] and his heirs with free ingress and egress thereto at all times hereafter by [the grantor] and his heirs.' " *Id.* at 660, 57 A.2d 279 (quoting deed). Nearly a century later, the company that came to own the larger tract of land sought to quiet title to its property, free of any claim of the grantor's heirs to either the burial ground or access to it. *Id.* at 660–61, 57 A.2d 279. There was no evidence that any portion of the larger tract had ever been used as a graveyard, the original grantor was interred elsewhere, and none of his heirs had any knowledge of a graveyard on the property. *Id.* at 665, 57 A.2d 279.

The Court held the reservation invalid:

The existence of the graveyard not having been established, the failure to locate any graveyard on the property at the present time, the absence of evidence that bodies were ever interred there, and the lack of sufficient description in the reservation to identify the intended graveyard with reasonable certainty, all lead us to the opinion that the reservation in question here is wholly inoperative. . . .[15]

*Id.* at 666, 57 A.2d 279.

In *McDonough,* the reservation identified a quantity of land, but gave no indication whatsoever of where, in the larger estate, the land was situated. In *Preston,* the grant was ambiguous as to the existence, not the location, of the easement. In *Potomac Electric,* the grant clearly identified the property subject to the easement and the electric company constructed specific poles on the property thereafter. In *Kelly,* the grant of easement was specific only as to the point of origin. The case before us is closest to *Kelly,* in which the Court held that a grant of an easement, strikingly similar to the one before us, did not violate R.P. § 4–101's statutory predecessor. Relying upon *Kelly,* we hold that the easement in this case does not violate R.P. § 4–101 because the deed establishing it clearly identifies the servient estate, provides a fixed starting point for the right-of-way, and specifies its width.

---

**15.** Cartage also relies on *Vrabel v. Donahoe Creek Watershed Authority,* 545 S.W.2d 53, 54 (Tex.Civ.App.1976). That case involved a purported easement that was described as " 'BEING 111.0 acres, more or less, out of a 250.5 acre tract of land in the Basil Durbin Survey, as more fully described in a [particular deed to the larger tract, recorded in the land records].' " *Vrabel,* 545 S.W.2d at 54 (quoting easement language). The Texas appellate court cited Texas's general rule that "for a contract to convey land to be sufficient, the description must be so definite and certain upon the face of the instrument itself, or, in some writing referred to, that the land can be identified with reasonable certainty." *Id.* However, the intermediate appellate court noted that, with regard to easements, the law in Texas was that: "The description requires a certainty such that a surveyor can go upon the land and locate the easement from such description." *Id.* Maryland has not adopted such a rule, although Cartage implicitly urges us to do so in this case.

This determination does not end our inquiry. Given the validity of the original language granting the easement, we must determine whether a court can establish the location of the easement, in the absence of subsequent agreement or use by the parties, by means of the equitable balancing approach used by the circuit court in this case.

## IV. Did the Circuit Court Err in Using the "Balancing Analysis" Developed in Maryland's Implied Easement–by–Necessity Cases to Locate the Easement?

As we discussed, the circuit court determined it could locate the right-of-way in this case by applying the equitable analysis used in implied easement-by-necessity cases, whereby the "way of necessity should be located so as to be the least onerous to the owner of the servient estate while, at the same time, being of reasonable convenience to the owner of the dominant estate." *Stair, supra,* 52 Md.App. at 111, 447 A.2d 109.

Cartage urges us to reject the circuit court's approach. It contends that, "[e]ven if, *arguendo,* an ambiguous or general easement did exist, the lower court had no legitimate method under law to describe where it would be located or to place it on the ground." Cartage continues: "No law enabled the plaintiff to freely pick where he would like it. No law provided the lower court with criteria to allow it to randomly describe or place one." Cartage suggests that "the court in effect became a surveyor," and that "the court ordered easement was randomly drawn out of whole cloth at a location to favor [Baer's] wishes." In its view: "No new law should be created here."

Cartage also observes that "jurisprudence dealing with the borrowed way of necessity law, has its own cautionary sign-posts which were overlooked by the lower court." As Cartage notes, "a way of necessity exists only so long as the necessity itself remains." *Shpak v. Oletsky,* 280 Md. 355, 363, 373 A.2d 1234 (1977). Cartage cites an early case on implied easements by necessity, *Oliver v. Hook,* 47 Md. 301 (1877), for the proposition that an easement-by-necessity "is only provision-

al," and if "the grantee acquires a new way to the estate previously reached by way of necessity, the way of necessity is thereby extinguished." *Id.* at 309. As we have seen, there was is no "necessity" in this case, because the Baer Parcel has its own frontage on Governor Lane Boulevard, including the area designated on the Fox Plat as a "Prop[osed] Entrance." In "pure necessity cases," Cartage argues, this lack of necessity "would cause the provisionally located easement to evaporate."

In support of its argument, Cartage cites the cases that we have noted above, in which Maryland courts have recognized the possibility of locating a general easement by means of subsequent agreements or use by the parties. According to Cartage, these cases imply that a general easement cannot be located in any other way. Cartage places particular reliance on *Rogers, supra,* 407 Md. 712, 967 A.2d 807, and *Hancock, supra,* 236 Md. 98, 202 A.2d 599. We pause to review those cases in more detail.

In *Rogers,* the Rogerses owned a large tract adjoining Landover Road. In 1963, the Rogerses sold two portions of the parcel in separate conveyances to two companies, SDN and Landover Gardens. *Rogers,* 407 Md. at 716–17, 967 A.2d 807. Landover Gardens obtained the portion of the larger tract that abutted Landover Road, while SDN received a portion between the Landover Gardens parcel and the parcel retained by the Rogerses. *Id.* The 1963 deeds reserved easements for access to Landover Road for the grantors over both the SDN parcel and the Landover Gardens. *Id.* However, as the Court of Appeals explained, both easements were, in effect, general easements. The SDN Deed "permitted two alternative right of way easements for the Rogers parcel for ingress/egress to Landover Road." *Id.* at 719, 967 A.2d 807. First, "SDN could create a private road designed to connect the Rogers property with ... the Landover Gardens Property[ ] and then onto Landover Road." *Id.* Or, in the alternative, " 'in lieu of such private roadway,' SDN could construct a public roadway as a means of access to Landover Road or to 'an existing public roadway leading to Landover Road.' " *Id.* (quoting deed). The

Landover Gardens Deed, on the other hand, "provided the Rogers parcel . . . with a right-of-way from the SDN property to Landover Road, over a specified location identified in a site plan." The site plan, however, "cannot be found in any records." *Id.* at 720, 967 A.2d 807. Ultimately, the SDN and Landover Gardens parcels were both purchased by a third company, Hunter's Ridge, and a dispute with the Rogerses ensued over the locations of the rights-of-way. *Id.* at 725–26, 967 A.2d 807.

When the case reached the Court of Appeals, the Court explained that the "SDN Deed reserved an easement in general terms, because it created an option to set the easement either by private or by public roadway, and did not specify the easement's location." *Id.* at 734, 967 A.2d 807. Moreover, "[t]he Landover Gardens Deed may have been a specific reservation when made, but the location of the easement became ambiguous by the unavailability of the site plan. . . ." *Id.* The lower courts had resolved the location dispute exclusively by interpreting the language in the deeds. The Court held this was error, vacated the judgment, and remanded the case with instructions for the trial court to determine the parties' intent. In remanding the case, the Court explained: "[E]vidence of subsequent conduct of the parties, including the Rogers[es]' [alleged] use of an easement and SDN's and Landover Gardens' [alleged] acquiescence to that use, or the easement's [alleged] extinction, needs to be adduced on remand of this case, in order to interpret the parties' intent." *Id.* at 735, 967 A.2d 807.

*Hancock* involved a dispute regarding a purported right-of-way to reach a tract of land called "Little Woods." *Hancock,* 236 Md. at 100, 202 A.2d 599. In 1898, the Hancocks' predecessor in title conveyed Little Woods, which had been part of a much larger tract that the grantor retained, to the predecessor of the Hendersons. *Id.* The deed by which Little Woods was conveyed "contained no express grant of a particular road in fee, or an easement therein." *Id.* However, the deed provided that Little Woods was conveyed " '[t]ogether with all and every, the rights, alleys, ways, waters, privileges, appurte-

nances and advantages, *outlets or roadways,* to the same belonging or in anywise appertaining.' " *Id.* (quoting deed; emphasis in *Hancock* ).

The *Hancock* Court explained: "There is a roadway running through the Hancock[s'] land to the Henderson tract, and it is over this the Hendersons claim an easement." *Id.* However, at trial, the Hendersons "were not able to prove that the roadway was in existence at the time of the July 1898 conveyance. The earliest date any witness could actually recall a use being made of a roadway was 1911." *Id.* The Hendersons claimed that "the language used in the 'together clause' was sufficient to constitute an express grant of a general easement which subsequently became fixed by usage of the particular roadway." *Id.* at 101, 202 A.2d 599.

The trial court agreed with the Hendersons, applying the doctrine elucidated in *Sibbel* that a general easement may become fixed by subsequent agreement or action of the parties. *Id.* at 101, 202 A.2d 599. However, the Court of Appeals vacated the trial court's decision, rejecting the Hendersons' claim to an express easement. *Id.* It said: "Even if we assume the phrase 'outlets or roadways' found in the deed were sufficient to convey an easement, [the Hendersons'] failure to prove the roadway was in existence or was agreed upon as a right of way in 1911 is fatal to substantiate an express grant of an easement." *Id.* The Court explained that the *Sibbel* rule "presupposes a clearly indicated intention of the parties, or at least of the grantor, to convey an easement. Such intention is thereafter made manifest in the conveyancing instrument, albeit in general rather than specific language. Such is not the case here." *Id.* at 102, 202 A.2d 599. The Court quoted the "early yet still important case" of *Oliver v. Hook, supra,* 47 Md. at 308, for the proposition that " 'terms . . . used in the deed, such as "with the ways now used," or "used with the land hereby conveyed," . . . would . . . pass[ ] the right to *such ways as had been actually used in connection with the part granted.' " Hancock,* 236 Md. at 102, 202 A.2d 599 (quoting *Oliver;* emphasis added). In the *Hancock* Court's view, because the Hendersons "failed to prove the

disputed roadway was in existence at the time of the severance of the parcel they now own, this claim of an express grant must also fail." *Id.*[16]

Relying on *Rogers* and *Hancock*, Cartage contends that "Baer failed to prove the existence of a road on the ground at the time of the grant," and "there was no agreement or actions which established or 'fixed' the location of an easement, and so Baer's claim for express easement should have likewise failed." He notes that in neither *Rogers* nor *Hancock* did the Court of Appeals raise the possibility that, in the absence of other evidence as to the location of the right-of-way, the trial court could locate the easement based on the equitable balancing analysis developed in cases involving implied easements by necessity.

For his part, Baer concedes that "the 'least onerous/reasonably convenient' standard developed and followed in the easement by necessity cases has not yet been directly applied by the Maryland appellate courts to express easements of a general nature." But, he urges, there are no cases holding that the equitable balancing standard cannot be applied "to determine the proper location of a general express easement that has not been determined in some manner by the parties themselves or their predecessors." [17]

---

**16.** Later in its opinion, however, the Court went on to hold that the Hendersons were entitled to an implied easement-by-necessity, and remanded "for further proceedings to locate the way by necessity" by means of the equitable balancing we have discussed, *supra.* *Hancock*, 236 Md. at 105–06, 202 A.2d 599.

**17.** Baer cites several cases from courts in other states that have endorsed use of an equitable balancing analysis to locate a general express easement. *See, e.g., Frenchtown Five L.L.C. v. Vanikiotis*, 863 A.2d 1279, 1282 (R.I.2004) (Under Rhode Island law, "the precise location of an easement need not be designated for the easement to be valid," and in such a case, "the holders of the dominant estate are entitled to a convenient, suitable, and accessible easement of way."); *Looney v. Blackwood*, 224 Ala. 342, 140 So. 400, 401 (1932) (A court of equity has the power to locate either a general express easement or an implied easement-by-necessity, but the courts "cannot do so arbitrarily, but will proceed, in defining and designating the boundaries, with due and proper regard for the rights of both parties, selecting such route as

Like the parties, we have not uncovered a reported case in Maryland in which either appellate court has held that an express easement should, or should not, be located by means of the "least onerous/reasonably convenient" equitable standard proposed by Baer. However, the Court of Appeals, albeit in *dicta*, has expressly endorsed the application of easement-by-necessity principles to locate a general express easement where the parties have not established the easement's location either by agreement or a history of use. Typical of these is *Burroughs v. Milligan*, 199 Md. 78, 85 A.2d 775 (1952), in which Court considered a case in which the parties agreed that the dominant owners had an express easement over an " 'existing road' " across the servient owners' property. *Id.* at 82, 85 A.2d 775 (quoting trial court). The parties disputed the width of the road. *Id.* at 83, 85 A.2d 775. Before the trial court, the dominant owners successfully argued that they were entitled to a road twenty feet in width, *id.* at 87, 85 A.2d 775, but the Court of Appeals rejected this claim. The Court noted that the chancellor found that the easement had granted a right-of-way over a then-existing "farm road through the woods," as to which the chancellor further found "that it was possible that when the road was used only for hauling out a few loads of wood a year, it was little more than two wheel tracks." *Id.* at 88, 85 A.2d 775. The Court also observed that "we can certainly take judicial notice of the fact, which is of common knowledge, that woods roads are not 20 feet wide." *Id.*

Because the road that existed at the time of the grant was not twenty feet wide, the Court opined that the trial court's

---

is reasonable and most feasible, and will not unduly burden the remainder of the grantor's land, nor will it, at the same time, unduly inconvenience the grantee in the location adopted").

Other cases to similar effect cited by Baer are: *Carroll Elec. Coop. Corp. v. Benson*, 312 Ark. 183, 848 S.W.2d 413, 416 (1993); *Atkinson v. Mentzel*, 211 Wis.2d 628, 566 N.W.2d 158, 164 (App.1997); *Beery v. Shinkle*, 193 S.W.3d 435, 440–41 (Mo.App.2006); *Burnham v. Mahoney*, 222 Mass. 524, 111 N.E. 396, 398 (1916); *Graff v. Budgett*, 69 S.D. 364, 10 N.W.2d 764, 765 (1943); *Ballard v. Titus*, 157 Cal. 673, 110 P. 118, 122 (1910).

grant of a twenty-foot-wide easement must have been "based upon a theory of reasonableness which may be applicable to ways of necessity, *and to general granted rights of way without any definite location,* but which has no place in a situation where the parties have contracted with respect to a definite right of way, namely, an existing road." *Id.* at 89, 85 A.2d 775 (emphasis added) (citation omitted). In concluding its opinion, the *Burroughs* Court reiterated: "We have no quarrel with the contention that where a right of way is given without any definite designation, what is meant is one that is reasonable under the circumstances of the case. This is the general law, and the law of this State, but it is not applicable to the situation before us." *Id.* at 91, 85 A.2d 775. *Dixon v. Frantz,* 249 Md. 138, 142, 239 A.2d 80 (1968) applied the *Burroughs* analysis to nearly identical facts.

Similarly, in *Sibbel v. Fitch,* 182 Md. 323, 34 A.2d 773 (1943), the Court considered an express easement to " 'a right of way to and from the [existing] graveyard' " that was surrounded by the servient property. *Id.* at 325, 34 A.2d 773 (quoting deed). There was an "Old Road" that had run to the graveyard at the time of the original deed and at least 50 years thereafter. *Id.* The question in the case was whether the dominant owners were entitled to use of a "new road" subsequently constructed on the servient property. *Id.* at 326, 34 A.2d 773. The Court ruled that the dominant owners were entitled only to use the "Old Road," and commented that, "while we are not dealing with a way of necessity, ... *the same principles with reference to the location of a way of necessity and the location of a right of way reserved in general terms are applicable." Id.* at 328, 34 A.2d 773 (emphasis added). *See also, Hanley v. Stulman,* 212 Md. 273, 129 A.2d 132 (1957) ("We think this is an application of the same principle, recognized by this Court for many years, that a right-of-way of necessity may be located by a court of equity where the right to such way is clear and undisputed. *And this seems to be the law in regard to easements generally." Id.* at 279–80, 129 A.2d 132 (citations omitted; emphasis added)).

Cartage's reliance on *Rogers* and *Hancock* as setting out a contrary rule of law is unpersuasive. In *Hancock*, the Court was faced with deed language that conveyed land to the grantee along with any " 'outlets or roadways, to the same belonging or in anywise appertaining.' " *Hancock*, 236 Md. at 100, 202 A.2d 599. The Court determined that *if* such ambiguous language, without any other description, was sufficient to create an easement (the Court assumed, *arguendo*, that it was), it could only have established an easement in a road that actually existed (and "belonged" or "appertained" to the property conveyed) at the time the deed was made. *Id.* at 101, 202 A.2d 599. *Hancock* does not preclude a court locating a right-of-way where, as here, the deed language makes clear reference to a right-of-way that does not exist on the ground at the time of the deed.

In *Rogers*, the location of the easements involved had been resolved at summary judgment, on the basis of the purported plain meaning of the deed language. *Rogers*, 407 Md. at 728, 967 A.2d 807. The circuit court and, on appeal, this Court, held that the deed language gave Hunter's Ridge the right to relocate the Rogerses' access to Landover Road unilaterally, despite the Rogerses' allegations that they had continuously used a particular path to reach Landover Road. *Id.* at 728–29, 967 A.2d 807. The Court of Appeals reversed, explaining that, because the easement grants in the deeds were "in general terms only, an ambiguity regarding the location of the easement exists. . . ." *Id.* at 732, 967 A.2d 807. Therefore, the matter could not be resolved at summary judgment, because "the ambiguity . . . may be resolved by reference to subsequent declarations and conduct of the parties, evidencing their intent." *Id.* at 734, 967 A.2d 807. In contrast, in the case before us, there is no evidence of "subsequent declarations and conduct of the parties" that is relevant to determining the easement's location. Therefore, unlike *Rogers*, there is no extrinsic evidence that can resolve the ambiguity in the easement language.

■ We conclude that the law in Maryland is that, where the parties cannot agree on the location of a hitherto unlocated express easement, an equity court is empowered to determine the location by balancing the equities of the parties. Our conclusion is supported, not only by *dicta* in the Maryland cases we have reviewed and the out-of-state authority cited by Baer, but also by several authoritative treatises on the law of real property.

In his turn–of–the–20th–Century treatise on easements, Professor Leonard A. Jones stated:

> The owner of the land over which there is an undefined way by express grant or by implication, has in the first instance the right to locate the way, for the owner of the easement in such a case is entitled to a convenient way only, and one which shall be as little as possible inconvenient to the owner of the land. If the owner of the land fails to exercise this right . . . or if he assigns a way that is unreasonable, the grantee may select a way that is convenient for himself, if that will not unreasonably interfere with the grantor in the enjoyment of his estate.

LEONARD A. JONES, EASEMENTS, § 337, at 274 (1898). Professor Jones further explained that "[a] right of way reserved, but not particularly defined, need be only such as is reasonably necessary and convenient for the purpose for which it was created" *id.*, § 339, at 275 (emphasis omitted), and that "[i]f the parties cannot agree upon the location of the undefined way, this may be determined in equity." *Id.*, § 354, at 284 (emphasis omitted).[18]

Other treatises are to like effect, although they emphasize the point that the court is only empowered to resolve the easement's location where the parties have not been able to

---

18. Professor Jones's treatise has been extensively cited by the Court of Appeals in cases involving easements. *See, e.g., Shpak, supra*, 280 Md. at 360, 373 A.2d 1234; *Dalton v. Real Estate & Improvement Co.*, 201 Md. 34, 47, 92 A.2d 585 (1952); *Sibbel, supra*, 182 Md. at 327–28, 34 A.2d 773; *Baugh v. Arnold*, 123 Md. 6, 11–12, 91 A. 151 (1914); *Serio v. Murphy*, 99 Md. 545, 556, 58 A. 435 (1904).

resolve among themselves a reasonable location for the easement. *See* 4 POWELL ON REAL PROPERTY, § 34.12, at 34–137 to –138 (Michael Allan Wolf, ed., 2000, 2010 Supp.) ("Courts generally hold, where the scope of an easement is unclear, that the servient tenant in the first instance, and the dominant tenant secondarily, has the power to define the scope by reasonable action."); 7 THOMPSON ON REAL PROPERTY, § 60.04(c)(1)(i), at 537 (David A. Thomas ed., 2d Thomas ed., 2006) ("If the grant does not specify the location of the easement, courts grant either party the right to locate the easement, so long as the easement is reasonable.").

The Third Restatement is also consistent with the foregoing principles. It provides:

### § 4.8 Location, Relocation, and Dimensions of a Servitude

Except where the location and dimensions are determined by the instrument or circumstances surrounding creation of a servitude, they are determined as follows:

(1) The owner of the servient estate has the right within a reasonable time to specify a location that is reasonably suited to carry out the purposes of the servitude.

(2) The dimensions are those reasonably necessary for enjoyment of the servitude.

Further, Comment b to § 4.8 explains:

The servient owner is given the power to locate a servitude in the first instance because the servient owner is better able to determine the location that will minimize the servitude's interference with current value and future development of the servient estate. The owner of the servitude is protected by the requirement that the location be reasonably suited for the purpose.

\* \* \*

If the servient owner fails to designate a suitable location within a reasonable time after requested to do so, the owner of the servitude may proceed to locate it. A location is suitable if it reasonably allows the purpose for which the servitude was acquired to be carried out while inflicting the

minimum amount of damage on the servient estate. *If necessary, the parties may resort to legal proceedings in which a location should be selected that strikes a balance between minimizing the damage to the servient estate and maximizing the utility to the owner of the servitude.*
*Id.* (emphasis added).

Accordingly, we hold that where, as here, an express easement has been established without fixing its location, and the location of the easement cannot be established either (a) by reference to a road or way in existence at the time of the deed; (b) by a subsequent, unopposed long-term use by the dominant tenant; or (c) by a subsequent agreement of the parties, the court may establish the easement's location so as to "be the least onerous to the owner of the servient estate while, at the same time, being of reasonable convenience to the owner of the dominant estate," *Stair, supra,* 52 Md.App. at 111, 447 A.2d 109, in light of the purposes of the easement.

## V. Did the Circuit Court Err in Granting Summary Judgment on Cartage's Abandonment, Estoppel and Adverse Possession Defenses?

We now consider whether the circuit court erred in rejecting Cartage's defenses to the easement claim at the summary judgment phase. Cartage raised defenses of abandonment, estoppel, and adverse possession. Baer retorted, however, that the undisputed material facts failed to support any of the claimed defenses, and the circuit court agreed. We shall consider the defenses in turn.

First, we consider the closely related defenses of abandonment and estoppel. As to the former:

"It is now very well settled ... that a party entitled to a right of way or other mere easement in the land of another may abandon and extinguish such right by acts *in pais,* and without deed or other writing. The act or acts relied on, however, to effect such result, must be of a decisive character; and while a mere declaration of an intention to abandon will not alone be sufficient, the question, whether the act of

the party entitled to the easement amounts to an abandon-
ment or not, depends upon the intention with which it was
done, and that is a subject for the consideration of the jury.
A cesser of the use, coupled with any act clearly indicative
of an intention to abandon the right, would have the same
effect as an express release of the easement, without any
reference whatever to time."

*Chevy Chase Land Company v. United States*, 355 Md. 110,
159, 733 A.2d 1055 (1999) (quoting *Vogler v. Geiss*, 51 Md. 407,
410 (1879) (internal citations omitted in *Chevy Chase Land* )).

■■■ The standards by which courts decide that an ease-
ment has been terminated by estoppel are closely related to
those for abandonment. In 4 POWELL ON REAL PROPERTY,
§ § 34.22[2] (Michael Allan Wolf, ed., 2000, 2010 Supp.), the
author explains that termination of an easement by estoppel
"consists of the creation of a reasonable belief that in the
future the dominant owner intends not to make the use of the
servient tenement authorized by the easement," coupled with
"conduct on the part of the servient owner in reliance upon the
above-described appearances, under such circumstances that a
continuance of the easement would be seriously harmful to the
servient owner." The author comments:

> The borderline between the terminability of easements by
> abandonment . . . and by estoppel is gray. Each requires
> conduct on the part of the dominant owner evidencing an
> intent to use the easement no further. In some cases the
> evidence of such conduct might well suffice to establish an
> abandonment, but when the operative facts include acts of
> the servient owner in reliance thereon, it becomes simpler
> to base the termination of the easement upon the theories of
> estoppel.

To the extent that Maryland cases have discussed loss of an
easement by estoppel, it has not been considered as a separate
means of terminating an easement, distinct from abandon-
ment. Rather, consistent with the passage from POWELL
quoted above, the cases have used "estoppel" as alternative
phraseology in the context of abandonment in some factual

situations. For example, in *United Finance Corp. v. Royal Realty Corp.*, 172 Md. 138, 147, 191 A. 81 (1937), the Court stated:

> But whether the basis for the relief be called equitable estoppel, or abandonment and reverter, is a mere matter of terminology of little relative importance, except to the verbal precisian. For in any case it involves the principle that one who, having an easement of way ... suffers his right to lie fallow and unused for a long period of time, and throughout the period suffers the owners of the servient tenement not only to use it as though no such right existed, but actually acquiesces in such use by ... permitting any uses of the land inconsistent with the existence of the easement, may be held to have sufficiently manifested such an intention of abandoning the right as will estop him from asserting it.

*See also Millson v. Laughlin*, 217 Md. 576, 589, 142 A.2d 810 (1958) (Evidence that the owner of a servient estate was "induced, by ... action of the owner of the easement to assume that there was an intention to abandon the easement, and to make improvements on the strength of this assumption" would support "finding of abandonment, or as it might otherwise be expressed, the owner of the easement might, in such case, be regarded as estopped to assert the easement.") (quoting 3 TIFFANY ON REAL PROPERTY § 825 (3d ed.1939)); *Baldwin v. Trimble*, 85 Md. 396, 403–04, 37 A. 176 (1897) (where a public easement had existed in a road, but the road had "been disused and abandoned as a road, and has actually been closed by buildings constructed across it for nearly its entire length," the easement was "abandoned so that the public are equitably estopped to reclaim it").

To the extent that the two doctrines differ, the distinction between ordinary abandonment and abandonment by estoppel rests on whose actions are at issue. Non-use is an essential, but by itself insufficient, ingredient for termination under either theory. For abandonment, there must also be a positive action on the part of the owner of the dominant estate. *See, e.g., Knotts v. Summit Park Co.*, 146 Md. 234,

240, 126 A. 280 (1924) (an easement "cannot be lost by mere non-user" alone); *Vogler v. Geiss*, 51 Md. at 410. In the estoppel cases, the dominant owner's acquiescence to actions by the *servient* owner, performed in reliance on the dominant owner's non-use, is substituted for acts by the dominant owner. ·*See Millson*, 217 Md. at 589, 142 A.2d 810; *Baldwin*, 85 Md. at 404, 37 A. 176.

Cartage's arguments to this Court are based on both theories. It contends that Donald Baer's failure to object as Cartage "aggressively utilized its parcel for heavy truck parking," including the use of the telephone poles as "backstops," coupled with the elder Baer's own insistence on the creation of the tree screen, were sufficient to raise an issue of material fact as to both abandonment and estoppel.

 Baer does not dispute, for the purposes of the summary judgment motion, that he and his predecessors-in-title never used the purported right-of-way. But, Baer asserts that Cartage's claim of abandonment fails, because neither he nor his predecessors (other than M.K.S.) ever knew about the easement. Baer argues that "an essential element of any claim of abandonment of an easement is a finding that the owner of the dominant estate intended to abandon the right." According to Baer, Donald Baer "clearly could not have intended to abandon a right of which he was completely unaware." While we are not persuaded by Baer's reasoning,[19] Cartage's arguments nonetheless fail.

---

**19.** Baer's position is supported by some out-of-state cases. *See, e.g., Tract Development Servs., Inc. v. Kepler,* 199 Cal.App.3d 1374, 246 Cal.Rptr. 469, 476–77 (1988) ("If it is the case that the Downs and Keplers were in fact unaware of their right to a private easement, they could hardly be held to have ever *intended* to abandon such a right.") (emphasis in original); *Clinger v. Hartshorn,* 89 P.3d 462, 468 (Colo. App.2003); *Dubinsky v. Cama,* 261 Mass. 47, 158 N.E. 321, 324 (1927); *Sabins v. McAllister,* 116 Vt. 302, 76 A.2d 106, 110 (1950); *Lindsey v. Clark,* 193 Va. 522, 69 S.E.2d 342, 344–45 (1952).

This position, however, appears to be inconsistent with the fundamental principle of Maryland law that, in matters involving real property conveyed by deed and properly recorded and indexed in the land records, parties are held as a matter of law to have constructive

 In order to survive summary judgment on its abandonment defense, Cartage would have to point to evidence from which a fact-finder could reasonably infer that Baer, or one of his predecessors in title, had performed an " 'act clearly indicative of an intention to abandon the right. . . .' " *Chevy Chase Land Co.,* 355 Md. at 159, 733 A.2d 1055. There is no such evidence for the simple reason that all of the material physical actions pertaining to the easement, namely, planting the screen of trees and placing the log barrier, were performed by Cartage or its predecessors, not Baer and his. Even taking Richmond's testimony in the light most favorable to Cartage, Baer's participation in the variance hearing does not rise to an act "of such a decisive character" as to indicate an intent to abandon the right of way. Cartage's estoppel argument also fails because there is nothing in the record that indicates that Cartage relied upon anything the owners of the Baer Parcel did or did not do in its use of its own property.

 We turn to consider Cartage's claim of adverse possession. " 'Adverse possession is a method whereby a person who was not the owner of property obtains a valid title to that property by the passage of time.' " *Yourik v. Mallonee,*

---

knowledge of encumbrances of record. *See, e.g., Steuart Transp. Co., supra,* 269 Md. at 95, 304 A.2d 788; *Beins, supra,* 155 Md.App. at 243–44, 843 A.2d 147. As the Supreme Court of Nebraska stated in *Mueller v. Bohannon,* 256 Neb. 286, 589 N.W.2d 852 (1999), a case that also involved an easement in the chain of title that had never been used:

> [The argument that] "it would be logically impossible for [the Bohannons, who owned the easement,] to [abandon the easement] because they did not know the location of the easement" . . . misses the mark because if the Bohannons did not know of the actual location of the easement, *they should have known.*
>
> * * * * * *
>
> Equity aids the diligent and not the negligent. The Bohannons had the means in their possession to obtain actual knowledge of the easement.

*Id.* at 860–61 (quoting appellate brief; emphasis added; some alterations in original, citations omitted); *see also Graves v. Dennis,* 691 N.W.2d 315, 318–19 (S.D.2004).

For the reasons set out in the main text, it is unnecessary for us to resolve this question as a matter of Maryland law.

174 Md.App. 415, 422, 921 A.2d 869 (2007) (citation omitted). A claim of adverse possession is composed of several elements: " '[T]he claimant must show possession of the property for the statutory period of 20 years.... Such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted.' " *White v. Pines Cmty. Improvement Ass'n*, 403 Md. 13, 36, 939 A.2d 165 (2008) (citation omitted). The "statutory period" derives from C.J. § 5–103, which requires that "[w]ithin 20 years from the date the cause of action accrues," a landowner must either "[f]ile an action for recovery of possession of a corporeal freehold or leasehold estate in land," or "[e]nter on the land." The critical element of adverse possession at issue in this case is "hostility."

▆ "Hostile" is a term of art in the law of adverse possession; it does not connote enmity, ill will, or the absence of neighborly cooperation. *Yourik*, 174 Md.App. at 429, 921 A.2d 869. Rather, in the context of the case before us, the term "signifies a possession that is adverse in the sense of it being 'without license or permission,' and 'unaccompanied by any recognition of . . . the real owner's right to the land.' " *Id.* (citation omitted).

▆ To disprove hostility, the record owner must show a "recognition of right" on the part of the adverse claimant, which means "*acceptance* that another has a *valid right* to the property, and the occupant possesses subordinately to that right," and not "mere acknowledgment or awareness that another claim of title to the property exists." *Yourik*, 174 Md.App. at 429, 921 A.2d 869 (emphasis in original). Further, "[i]n evaluating a claim, the pertinent inquiry is whether the claimant has proved the elements 'based on the claimant's "objective manifestation" of adverse use, rather than on the claimant's subjective intent.' " *Porter v. Schaffer*, 126 Md.App. 237, 276, 728 A.2d 755 (1999) (citation omitted).

▆ Most adverse possession cases involve extinguishment of fee ownership through adverse possession, but an easement may be terminated through adverse possession as

well. *See, e.g., Klein v. Dove,* 205 Md. 285, 295, 107 A.2d 82 (1954). However, in such a case, the adverse claimant is the servient owner—in other words, the putative adverse possessor is the actual owner in fee of the real property subject to the easement, who already has possession of the land in any event. As POWELL ON REAL PROPERTY observes, this "creates some difference in the type of use that will be considered sufficiently adverse to start the prescriptive period." 4 POWELL ON REAL PROPERTY, § 34.21[1]. The challenges are increased where, as here, the owner of the dominant estate makes no effort to use the easement. The treatise author explains, *id.* (footnotes omitted, emphasis added):

> The use of the land by the servient tenant must be one that is incompatible or irreconcilable with the authorized right of use. . . . Where the dominant owner abstains from use of the easement, the servient owner, in the exercise of the privilege to use his or her own land in any manner desired not interfering with the exercise of the easement, has an enlarged scope of privileged action. *It is, therefore, under these circumstances more difficult for the servient owner to establish the adverse character of behavior. Unless the conduct is actionable by the dominant owner, it cannot result in a prescriptive extinguishment of the easement.*

In this case, Cartage observes that "a physical right-of-way was never actually established," and contends: "With this in mind, it is evident that both USA Cartage and its predecessor had *always* used that undefined and unused area for their exclusive use" for more than twenty years. Cartage maintains that its use "was objectively manifested . . . by the railroad ties, tree screening, [and] daily parking without challenge from 1986 for greater than 20 years."

Baer retorts that there was no evidence "that the railroad ties and other objects near the Property line were intended to create a permanent, insurmountable barrier to access to Baer's Property from the existing entrance on Governor Lane Boulevard." As he did in the circuit court, Baer contends that Richmond's deposition testimony "directly contradicted" his assertion in his affidavit that the telephone poles and/or

railroad ties prevented vehicular traffic across the property line. Moreover, Baer argues that "there was no evidence that these uses (even if they were adverse in nature) continued without interruption for a period of at least twenty years, because Mr. Richmond clearly lacked the requisite personal knowledge to make such an assertion in his Affidavit."

In our view, the trial court erred by resolving the issue of adverse possession on the basis of Cartage's purported intent. The circuit court concluded that "there's no necessary, intent found from merely placing [the telephone poles] there that this is to be a permanent sealing off of the right of way. Because it's just as consistent when you're parking trucks somewhere to have a barrier for the trucks to pull up against just so the drivers of the trucks know where they're supposed to park the truck...."

As we have seen, unless the adverse claimant has manifested an acknowledgment that the record owner holds a superior right to the claimed property (which would defeat the element of hostility), the adverse claimant's intent is irrelevant to adverse possession. Rather, "the pertinent inquiry is whether the claimant has proved the elements 'based on the claimant's "objective manifestation" of adverse use, rather than on the claimant's subjective intent.' " *Porter*, 126 Md.App. at 276, 728 A.2d 755 (citations omitted). It is entirely possible for a claimant to adversely possess land for the statutory period inadvertently, without realizing or intending to encroach on another's property. As noted, adverse possession is not based on the claimant's subjective intent; "the fact that the possession was due to inadvertence, ignorance, or mistake, is entirely immaterial." *See Tamburo v. Miller*, 203 Md. 329, 336, 100 A.2d 818 (1953).

Certainly, the actions by Cartage and its predecessor-in-title, to plant a row of trees along the boundary with the Baer Parcel to place a row of telephone poles inside the trees had the effect of obstructing the easement and could give rise to a right to both injunctive relief and damages. *See, e.g., Miller v. Kirkpatrick*, 377 Md. 335, 350–52, 833 A.2d 536 (2003);

*Maddran v. Mullendore,* 206 Md. 291, 297, 111 A.2d 608 (1955). We are not persuaded by Baer's assertion that Richmond's deposition testimony was inconsistent with the proposition that the telephone pole boundary between the properties was impassable. Richmond testified that he had never seen a vehicle cross the poles and that no truck in Cartage's possession would be capable of crossing the poles. He expressly testified that "there would be no way to go over the poles." Richmond did acknowledge the possibility that it would "depend[ ] on the vehicle," and that the question of whether the line of poles made the boundary impassable might be "subjective," but, he said, "[m]y point is that it did." At trial, the fact finder might disbelieve Richmond, or might be persuaded by photographic exhibits or other testimony that the boundary was passable. But, at the summary judgment stage, at which the court must "constru[e] against the moving party any reasonable inferences that may be drawn from the facts," *120 W. Fayette St., LLLP v. Mayor of Balt.,* 413 Md. 309, 329, 992 A.2d 459 (2010), the reasonable inference to be drawn from Richmond's deposition was that the boundary between the properties was not passable by vehicle.

Similarly, we are not persuaded by Baer's claim that Cartage failed to establish the element of continuous adverse possession for the statutory period simply because Richmond had no direct knowledge of what occurred on the property in the four or five year "gap" during which Cartage was not an occupant (either as a tenant or owner) of the Cartage Parcel. Richmond testified that the telephone poles were already in place when Cartage first became a tenant in 1986, and were still in place when Cartage purchased the property in 1995. From those facts, it is reasonable to infer that the telephone pole barrier was not moved in the intervening time, and as the non-moving party, Cartage was entitled to the benefit of that inference.

Cartage was not in possession of the property for the entire twenty year period. However, Cartage is in privity of estate with the Glesners, both as predecessors in title, *see*

*Rosencrantz v. Shields,* 28 Md.App. 379, 384–86, 346 A.2d 237
(1975), and, for a time, as Cartage's landlord. *See, e.g.,
Italian Fisherman, Inc. v. Middlemas,* 313 Md. 156, 163, 545
A.2d 1 (1988) (a tenant is in privity of estate with its landlord).
Moreover, a landlord can adversely possess land through
occupation by its tenants. *See Hackett v. Webster,* 97 Md. 404,
407–14, 55 A. 480 (1903); *see also* 2 C.J.S. *Adverse Possession*
§ 47 (1941) (tenant may adversely possess land "on behalf of"
landlord). Aside from its assertion that Richmond did not
have personal knowledge sufficient to testify as to possession
for the statutory period, Baer raised no issue in its summary
judgment motion with respect to tacking of Cartage's posses-
sion to its successor tenants or to the Glesners, nor did the
circuit court rule on that issue in granting summary judgment.
" 'Ordinarily, an appellate court should review a grant of
summary judgment only on the grounds relied upon by the
trial court.' " *Sadler v. Dimensions Healthcare Corp.,* 378 Md.
509, 537 n. 10, 836 A.2d 655 (2003) (citation omitted). There-
fore, we do not further consider the issue of tacking here. In
granting summary judgment as to adverse possession on the
basis of Cartage's subjective intentions in planting the trees
and maintaining the parking barrier, the circuit court erred.

## VI. Did the Circuit Court Misapply
## the "Balancing Test"?

Because we will remand this case for further proceedings,
we need not resolve Cartage's contention that the circuit court
misapplied the equitable balancing approach in the case at bar.
But, for the benefit of the parties and the court on remand, we
shall provide brief guidance.

We reiterate that the circuit court is granted wide discretion
in making equitable determinations. Baer submitted a pro-
posed location for the easement. It may not be the "least
onerous" easement to Cartage that is possible, but Cartage
presented no evidence of a location that would be less onerous
while still providing reasonable convenience to Baer; instead,
Cartage chose to submit a proposed "location" for the ease-
ment that did not cross its property (and was therefore

accurately described by Baer as not being a right-of-way at all).

Nevertheless, we recognize that the parties and the circuit court did not have the benefit of the analysis we have conducted regarding the appropriate procedure by which a general express easement may be located. On remand, if the circuit court determines that Cartage's defenses to the easement do not succeed, the circuit court should conform to the procedure specified in the Third Restatement to locate the easement. In other words, it should permit Cartage to propose a location for the right-of-way in the first instance, because Cartage, as the servient owner, is in the best position to determine what placement would be least onerous to it. The court should make its own equitable determination of the easement's location only if Cartage's proposal does not conform to the express attributes of the easement, *i.e.*, 25 feet in width, and running from the "existing entrance," across some portion of the Cartage Parcel to the Baer Parcel, and does not otherwise provide reasonable access to the Baer Parcel, including safe and appropriate radii for turning vehicles.

**THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY IS VACATED AND THIS CASE IS REMANDED TO IT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLANT TO PAY 50% OF THE COSTS, APPELLEE TO PAY 50% OF THE COSTS.**